CashCall shall have no authority to use any trade names, trademarks, or service marks of Bank except by means of Program Materials or Advertising Materials approved by Bank pursuant to this Section. Likewise, Bank acknowledges that approved Program Materials or Advertising Materials may contain trade names, trademarks, or service marks of CashCall, and Bank shall have no authority to use any such names or marks separate and apart from their use in the Program Materials or Advertising Materials. The parties shall use Program Materials and Advertising Materials only for the purpose of implementing the provisions of this Agreement and shall not use Program Materials or Advertising Materials in any manner that would violate the Rules or any provision of the Program Guidelines.

Section 4.2    Accounting System.   CashCall shall develop and maintain, at its sole cost and expense, a comprehensive accounting and loan tracking system to accurately and immediately reflect all Applications, Loans, and related information regarding the Program to satisfy the information requirements of Bank, Regulatory Authorities, and Bank's internal and external auditors, as such information requirements have been disclosed to CashCall. The system shall provide Bank with access to copies of all documentation authenticated by Applicants and Borrowers, including the information needed for Bank to underwrite and approve Loans pursuant to the Program Guidelines. CashCall further agrees that the information reporting features, integrity, and security of the system shall operate to the reasonable satisfaction of Bank, Regulatory Authorities, and Bank's internal and external auditors. CashCall agrees that Bank shall have reasonable access to the system (which access shall be identical to the access provided to Cash Call's own employees) provided at CashCall's expense, and acknowledges that Bank will rely upon the system, and the information maintained therein, for obtaining information regarding Applications, Loans, and the Program in general. CashCall further agrees that the system shall provide such daily settlement reports, including reports noting the Applications ready for underwriting and a summary report of Loans to be funded. The system shall further calculate the Bank fees to be paid by CashCall and other similar information which shall be updated throughout the business day.

## ARTICLE V.  COMPLIANCE PERFORMANCE

Section 5.1    Bank Relationship Officer.

(a)    A specified Bank representative reasonably acceptable to CashCall (the "Bank Relationship Officer") shall have reasonable access to CashCall's and any Third Party Service Providers' facilities, personnel and records to review and examine the same for adherence to policies, procedures, and Rules that apply to Bank and the Program. The Bank Relationship Officer shall be permitted to utilize a reasonable system of routine monitoring, sampling, and other review methods by which to evaluate CashCall's performance of its obligations and shall be granted access to those personnel at CashCall or any Third Party Service Provider who can answer questions or inquiries related to the Program. The Bank Relationship Officer shall have access to audit reports and quality assurance reviews conducted by CashCall or any other external party regarding the Program. CashCall shall designate a specified representative reasonably acceptable to the Bank (the "CashCall Relationship Officer") to coordinate matters related to the Program with the Bank Relationship Officer and ensure that the Bank Relationship

- 8 -

CASHCALL-WVAG 00001
CONFIDENTIAL

Officer is permitted to undertake the activities contemplated herein. The Bank and CashCall shall consult with each other prior to replacing the relationship officer of each party as identified herein, and in good faith discuss any reasonable objection the other Party may have to such replacement.

(b)     Subject to Section 11.5 herein, CashCall agrees to provide the Bank Relationship Officer and the Bank's internal audit staff with electronic access to all customer records contained in the CashCall's or any Third Party Service Provider's systems. Such access shall be made available at Bank or onsite at CashCall's place of business.

Section 5.2   Performance Matrix. In order to assist Bank and CashCall in assessing and confirming the Program's compliance with the applicable Rules, Bank and CashCall shall develop a performance matrix (the "Performance Matrix") that sets forth the following categories of information:

(a)     Key performance indicators in each major functional area of the Program;

(b)     Acceptable performance ranges for each such indicator;

(c)     Frequency with which each such indicator shall be updated, and

(d)     Supporting management reports from which appropriate data can be located.

Bank and CashCall further agree to reasonably cooperate to resolve any areas identified in the Performance Matrix to be outside the performance ranges agreed upon by the parties.

## ARTICLE VI.  LOAN PURCHASES BY CASHCALL

Section 6.1   Purchase by CashCall; Assignment.

(a)     CashCall will buy, and Bank will sell, each Loan originated and disbursed by Bank (3) three days after such Loan is originated and funds are disbursed by the Bank. The purchase price for each Loan shall be equal to the outstanding balance due on each such Loan, including all principal, interest, origination fees, and other charges or sums owed by the Borrower. With respect to each Loan to be purchased on a Business Day, CashCall shall pay Bank the purchase price for the Loans by wire transfer not later than 12:00 noon Central Time on such day. With respect to any Loan to be purchased on a date that is not a Business Day, CashCall shall pay Bank the purchase price for the Loans by wire transfer not later than 10:00 a.m. Central Time on the next Business Day. Upon purchase of each Loan, all of the Bank's right, title, and interest to such Loan shall be assigned by Bank to CashCall without recourse. The assignment shall be accomplished through such documentation as the parties may from time to time agree, including a Bill of Sale or other form of assignment. Following the assignment, CashCall shall receive all payments of principal, interest, and fees generated by the Loan and shall have all responsibility for the servicing and collection of the transferred Loan. The Bank shall

CASHCALL-WVAG 00001
CONFIDENTIAL

hold in trust and promptly, but in no event later than the following business day, forward to CashCall any amounts received on any transferred Loan.

(b)     Notwithstanding the provisions of Section 4.1 or any other provisions of this Agreement, CashCall shall not alter the interest rates to be paid by Borrowers under the Loan Documents prior to the purchase of the Loan described herein without Bank's prior written consent, which consent may be withheld in Bank's sole discretion.

## ARTICLE VII.  COMPENSATION

Section 7.1     Implementation Fee.  CashCall shall pay Bank a non-refundable Program implementation fee of the greater of ▇▇▇ or the sum of all itemized costs incurred by Bank prior to the Commencement Date, including but not limited to reasonable legal costs, equipment costs, due diligence costs, and facilities costs (the "Bank Implementation Fee"). ▇▇▇ ▇▇▇ of the Bank Implementation Fee shall be due upon execution of this Agreement, and the balance, if any, shall be payable on the Commencement Date.  Under no circumstances shall the Implementation Fee exceed ▇▇▇.

Section 7.2     Bank Interest and Marketing Fee.

(a)     Bank shall be entitled to retain all loan origination fees on the Loans and all interest income and charges owed on the Loans up to, but not including, the day each Loan is sold to CashCall.

(b)     For the first ▇▇▇ in loans originated during a contract year, Bank shall pay CashCall a marketing fee (the "Marketing Fee") on each Loan originated in accordance with the following schedule:

| Loan Amount | Marketing Fee |
|-------------|---------------|
| ▇▇▇         | ▇▇▇           |
| ▇▇▇         | ▇▇▇           |
| ▇▇▇         | ▇▇▇           |

(c)     For each Loan originated and disbursed under the Program between ▇▇▇ and ▇▇▇ in total Loans in a contract year, Bank shall pay CashCall a marketing fee on each such Loan originated in accordance with the following schedule:

| Loan Amount | Marketing Fee |
|-------------|---------------|
| ▇▇▇         | ▇▇▇           |
| ▇▇▇         | ▇▇▇           |
| ▇▇▇         | ▇▇▇           |

- 10 -

CASHCALL-WVAG 000017
CONFIDENTIAL

(d)     For each Loan originated in excess of ██████████ in total Loans in a contract year, Bank shall pay CashCall a marketing fee on each such Loan originated in accordance with the following schedule:

| Loan Amount | Marketing Fee |
|---|---|
| ██████ | ██████ |
| ██████ | ██████ |
| ██████ | ██████ |

(e)     The tiered marketing fee schedule described in sub-paragraphs (b), (c), and (d) of this Section 7.2 shall be replicated in each subsequent year of the contract. The first year shall commence as of the Commencement Date. The marketing fee shall be paid by Bank to CashCall by automated clearinghouse transfer not later than 3:00 P.M. Central Time on the day the Loan is purchased if the day the Loan is purchased is a Business Day, or by 3:00 p.m. Central Time on the next Business Day if the day the Loan is purchased is not a Business Day.

Section 7.3     Minimum Bank Revenue.   Bank shall be guaranteed to receive a minimum amount of Net Revenue for each month in accordance with the following schedule:

| Pilot Term | Minimum Net Revenue |
|---|---|
| Months 1 – 3 | ██████ per month |
| Months 4 – 6 | ██████ per month |
| Months 7 – 12 | ██████ per month |
| Months 13 – 18 | ██████ per month |

For purposes of this Agreement, Bank's "Net Revenue" shall be defined as the sum of the interest, loan origination fees, and other charges paid to Bank by CashCall pursuant to Section 6.1 (excluding the principal owed on the Loan) less the marketing fee paid to CashCall pursuant to Section 7.2. In the event Bank does not receive the minimum Net Revenue amount set forth above in the identified month, CashCall shall pay Bank an amount necessary to achieve the applicable minimum revenue amount. Bank shall provide CashCall with an invoice for any sums due and owing under this Section 7.3 and CashCall shall pay the same within ten (10) days. In the event Bank elects to terminate the Program under Sections 8.2(a)(iii) or 8.2(c), CashCall shall have no liability for any sums pursuant to this Section 7.3 after and including the effective date of the termination. In the event CashCall elects to terminate the Program under Sections 8.2(a)(iii) or 8.2(c), the minimum Net Revenue amount would continue to apply for three months following the termination and, thereafter, CashCall shall have no liability for the minimum Net Revenue requirements set forth herein.

Section 7.4     Bank's Operational Costs.   Bank's non-reimbursable Operational Costs for the Program will be limited to ██████████ of the Net Revenue earned by Bank. CashCall shall reimburse Bank for Operational Costs in excess of ████ of the Net Revenue paid to Bank, as follows: on a monthly basis during the term of the Agreement, Bank will provide CashCall with a written itemization of Operational Costs as compared to Bank's Net Revenue received during the month. In the event that Bank's Operational Costs exceed ██████████

- 11 -

CASHCALL-WVAG 00001
CONFIDENTIAL

█ of the Net Revenue paid to Bank for that month, CashCall will reimburse Bank for such excess costs ("Excess Cost Reimbursements"). Within thirty (30) days after each three (3) month period following the Commencement Date, and within thirty (30) days of the end of each three (3) month period thereafter, Bank will provide CashCall with a summary of the Operational Costs as compared to the Net Revenue of Bank for the prior three (3) month period. If the calculated Operational Costs in excess of █ of the Bank's total compensation for such period are less than the total amount of Bank's Net Revenue for such period are less than the total amount of Excess Cost Reimbursements for the prior three (3) month period, Bank will reimburse CashCall for the difference; but only to the extent of amounts received from CashCall in respect of Excess Cost Reimbursements during such period. Within thirty (30) days of each anniversary date, Bank will provide CashCall with a summary of the Operational Costs as compared to Bank's Net Revenue for the prior 12-month period. If the calculated Operational Costs in excess of █ of the Bank's Net Revenue for such 12-month period are less than the total amount of Excess Cost Reimbursements for such 12-month period, Bank will reimburse CashCall for the difference; but only to the extent of amounts received from CashCall in respect of Excess Cost Reimbursements during such period. CashCall shall also pay to Bank an adjustment fee in the sum of █ per Loan for each █ Loan originated in the first █ in total Loans sold to CashCall during any contract year. The adjustment fee will be paid or credited on a monthly basis for any applicable month and shall be included in the calculation of Net Revenue solely for purposes of this Section 7.4, CashCall shall pay all sums due and owing to Bank under this Section 7.4 to First Community Financial, Inc., an affiliate of Bank, at 126 West 2nd Street South, P.O. Box 5057, Brookings, SD 57006-5057. CashCall shall have the right from time to time to audit the Bank's accounting with respect to the calculation of Operational Costs.

## ARTICLE VIII. TERM AND TERMINATION

Section 8.1    Term.  This Agreement shall be effective as of August 2, 2006, and shall continue in full force and effect through the date eighteen (18) months following the Commencement Date (the "Initial Term"), unless otherwise terminated as provided herein. After the Initial Term or Renewal Term, as the case may be, the Agreement shall automatically extend for a successive two (2) year period (the "Renewal Term") unless either party notifies the other of its intent to terminate this Agreement at least sixty (60) days prior to the end of the Initial Term or any Renewal Term. The termination of this Agreement shall not terminate, effect, or impair any rights, obligations, or liabilities of either party hereto that may accrue prior to such termination or that, under the terms of this Agreement, continue after the termination.

Section 8.2    Termination.

(a)    Termination by Either Party.  Either party to this Agreement may terminate the Agreement as follows:

(i)    Event of Default.  Upon occurrence of an event of default by CashCall or Bank, the other may terminate this Agreement (i) in the case of an event of a monetary default by CashCall, immediately upon the giving of written notice of termination by Bank, and (ii) in the case of an event of a

CASHCALL-WVAG 00001
CONFIDENTIAL

monetary default by Bank or a non-monetary default by either party, following the provision of written notice identifying the default and the defaulting parties' failure to cure the same within ten (10) banking days.

(ii)    Bankruptcy. Either party may terminate this Agreement at any time upon notice to the other after the filing by the other party of any petition in bankruptcy or for reorganization or for debt consolidation under the federal bankruptcy laws or under any comparable law.

(iii)   Discretionary Termination. Either party may terminate this Agreement at any time upon the provision of thirty (30) days prior written notice to the other party.

(b)    Bank shall have the right to terminate this Agreement immediately upon written notice to CashCall if Bank determines in its reasonable discretion that the activities of the parties under this Agreement or the Program are illegal under or prohibited by any of the Rules, provided, however, that if the illegality or prohibition is a state or local rule, Bank may in its discretion discontinue the origination of loans in those states or localities affected by the Rule without terminating this Agreement in its entirety for such reason.

(c)    Bank shall have the right to terminate this Agreement upon thirty (30) days written notice to CashCall, or earlier if otherwise required by any Regulatory Authority, upon written notice to CashCall, if any Regulatory Authority having jurisdiction over Bank requests or requires that the Bank terminate this Agreement.

(d)    Bank shall have the right to terminate this Agreement upon thirty (30) days written notice to CashCall, or earlier if necessary to avoid the potential for material loss to Bank, if Bank determines in its reasonable discretion that the continuing operation of the Program may materially adversely affect the safety and soundness of Bank.

Section 8.3    Duties Upon Termination. Upon the termination of this Agreement, Bank shall terminate the origination of any new Loans and both parties shall cooperate in order to ensure a smooth and orderly termination of their relationship. Notwithstanding any termination of the Agreement, the provisions of Article I, Section 4.2, Article IX, and Sections 11.1, 11.2, 11.4, 11.5, and 11.7 shall continue to govern the relationship of the parties hereto.

## ARTICLE IX. SETTLEMENT RESERVE AND GUARANTY

Section 9.1    Security Deposits.

(a)    Settlement Reserve; Setoff Rights. Upon execution of this Agreement, CashCall agrees to deposit a Settlement Reserve with Bank in the sum of ██████ (the "Settlement Reserve"). Thereafter, CashCall shall maintain a balance in the Settlement Reserve equal to the

- 13 -

CASHCALL-WVAG 00002
CONFIDENTIAL

sum of the total dollar amount of Loans originated by Bank but yet to be purchased by CashCall ("Loans on Book") or ▬▬▬▬, whichever is greater.  The amount of the Settlement Reserve shall be calculated and increased by CashCall, if necessary, on a daily basis.  CashCall shall anticipate any necessary increase in the balance of the Settlement Reserve, and shall transfer the additional funds to Bank by a wire transfer to be received no later than 2:30 p.m. Central Time on each day. Notwithstanding any other provision in this Agreement, Bank's duty to originate and fund new Loans each day shall be limited to an amount of Loans equal to the lesser of the amount of the Loans available to be originated and funded or the amount by which the Settlement Reserve exceeds the Loans on Book. In the event the balance in the Settlement Reserve exceeds the amount required pursuant to this Section 9.1(a), Bank shall return said excess funds to CashCall by wire transfer. Notwithstanding the foregoing, Bank shall only be obligated to refund excess amounts in the Settlement Reserve to CashCall one time per calendar month.  The funds in the Settlement Reserve on deposit with Bank shall be held in a non-interest bearing deposit account and shall be maintained in the name of CashCall, but shall be subject to the sole control of Bank until such time as any amounts remaining in such account are returned by Bank to CashCall upon termination of this Agreement and payment in full of all obligations owed by CashCall to Bank. In addition, for the purpose of securing CashCall's obligations to Bank under this Agreement, CashCall hereby grants to Bank a security interest and right of offset in such Settlement Reserve and all funds held therein and also all other amounts due and owing from Bank to CashCall as security for all of CashCall's obligations owed to Bank under this Agreement.  Without limiting the foregoing, CashCall agrees that the funds in the Settlement Reserve may be used by Bank to fund CashCall's purchases of Loans under this Agreement. Upon termination of this Agreement, and repayment in full of all obligations of CashCall owed to Bank, and the full performance of all obligations of CashCall hereunder, but in no event later than 30 days after Bank determines that all of CashCall's obligations that are owed or accrued, or that are likely to be owed or to accrue based upon notice received by the Bank, have been paid in full, Bank shall return any remaining amounts held in the Settlement Reserve to CashCall.  In addition to any other rights or remedies that Bank may have as a result of the default hereunder by CashCall, CashCall agrees that Bank shall have the right to setoff against any other monies or property of CashCall in the possession of Bank to recover any amounts due from CashCall. CashCall agrees that none of its deposits at Bank shall be considered "special" deposits unavailable for setoff by Bank unless Bank has specifically so agreed in a separate writing. CashCall further agrees that the rights and remedies of Bank described herein are in addition to all other rights which Bank may have by law or equity, including SDCL 44-11-11.

     (b)    <u>Cash Reserve</u>.  CashCall shall further maintain an additional deposit with Bank in the sum of ▬▬▬▬(the "Cash Reserve").  Bank acknowledges that any excess sums deposited by CashCall into the Settlement Reserve over and above the balance required to be maintained therein under this Agreement shall be credited toward the balance CashCall must deposit for the Cash Reserve.  The funds in the Cash Reserve on deposit with Bank shall be held in a non-interest bearing deposit account and shall be maintained in the name of CashCall, but shall be subject to the sole control of Bank until such time as any amounts remaining in such account are returned by Bank to CashCall upon termination of this Agreement in payment of all obligations owed by CashCall to Bank.  In addition, for the purpose of securing CashCall's obligations to Bank under this Agreement, CashCall hereby grants to Bank a security interest and right of offset in such Cash Reserve and all funds held therein and also all other amounts due and

- 14 -

CASHCALL-WVAG 000(
CONFIDENTIAL

owing from Bank to CashCall as security for all of CashCall's obligations owed to Bank under this Agreement. Without limiting the foregoing, CashCall agrees that the funds in the Cash Reserve may be used by Bank to fund CashCall's purchases of Loans under this Agreement. Upon termination of this Agreement, and repayment in full of all obligations of CashCall owed to Bank, and the full performance of all obligations of CashCall hereunder, but in no event later than thirty (30) days after Bank determines that all of CashCall's obligations that are owed or accrued, or that are likely to be owed or to accrue based upon notice received by the Bank, have been paid in full, Bank shall return any remaining amounts in the Cash Reserve to CashCall. In addition to any other rights or remedies that Bank may have as a result of the default hereunder by CashCall, CashCall agrees that Bank shall have the right to setoff against any other monies or property of CashCall in the possession of Bank to recover any amounts due from CashCall. CashCall agrees that none of its deposits at Bank shall be considered "special" deposits unavailable for setoff by Bank unless Bank has specifically so agreed in a separate writing. CashCall further agrees that the rights and remedies of Bank described herein are in addition to all other rights which Bank may have by law or equity, including SDCL 44-11-11.

Section 9.2   Guaranty.   As further security for CashCall's obligations to Bank under this Agreement, CashCall agrees to procure the personal guaranty of Guarantor of all of the obligations of CashCall owed to Bank herein. CashCall further agrees to compel Guarantor to provide a signed personal financial statement to the Bank in advance of the execution of this Agreement and a new signed updated personal financial statement annually thereafter.

## ARTICLE X.  REPRESENTATIONS AND WARRANTIES

Section 10.1   CashCall's Representations and Warranties.   CashCall makes the following warranties and representations to Bank, all of which shall survive the execution and termination of this Agreement for any reason:

(a)   This Agreement is valid, binding and enforceable against CashCall in accordance with its terms and CashCall has received all necessary approvals for such purposes.

(b)   CashCall is a corporation duly organized, validly existing, and in good standing under the laws of the state of California and is authorized, registered, and licensed to do business in each state in which the nature of its activities makes such authorization, registration, or licensing necessary or required.

(c)   CashCall has the full power and authority to execute and deliver this Agreement and perform all of its obligations hereunder.

(d)   The execution of this Agreement and the completion of all actions required or contemplated to be taken by CashCall hereunder are within the ordinary course of CashCall's business.

(e)   The provisions of this Agreement and the performance of each of its obligations hereunder do not conflict with CashCall's organizational or governing documents,

- 15 -

CASHCALL-WVAG 000022
CONFIDENTIAL

of any agreement, contract, lease, or obligation to which CashCall is a party or by which CashCall is bound, including any exclusivity or other provisions of any other agreement to which CashCall or any related entity is a party, and including any non-compete agreement or similar agreement limiting the right of CashCall to engage in activities competitive with the business of any other party.

(f)     CashCall has not, and will not, utilize the intellectual property, trade secrets, or other confidential business information of any third party in connection with the development of the Program Materials and Advertising Materials.

(g)     Neither CashCall nor any principal thereof has been or is the subject of any of the following:

    (i)     Criminal conviction;

    (ii)     IRS lien;

    (iii)     Enforcement agreement, memorandum of understanding, cease and desist order, administrative penalty, or similar agreement concerning lending matters, or participation in the affairs of a financial institution;

    (iv)     Administrative or enforcement proceeding or investigation commenced by the Securities Exchange Commission, state securities regulatory authority, Federal Trade Commission, any banking regulator, or any other state or federal Regulatory Authority, with the exception of routine communications from a Regulatory Authority concerning a consumer complaint and routine examinations of CashCall conducted by a Regulatory Authority in the ordinary course of CashCall's business; or

    (v)     Restraining order, decree, injunction, or judgment in any proceeding or lawsuit alleging fraud or deceptive practices or illegal activity on the part of CashCall or any principal thereof.

For purposes of this subsection the word "principal" of CashCall shall include (i) any person exercising Control over CashCall, (ii) any officer or director of CashCall, and (iii) any person actively participating in the control of CashCall's business.

(h)     The Loans will only be marketed in states in which the applicable Rules do not require Bank to be licensed or registered or, where agreed upon by Bank and CashCall, Bank has obtained all necessary licenses and registrations at CashCall's expense.

Section 10.2   <u>Bank's Representations and Warranties</u>.  Bank makes the following warranties and representations to CashCall, all of which shall survive the execution and termination of this Agreement for any reason:

- 16 -

CASHCALL-WVAG 00002:
CONFIDENTIAL

(a)  This Agreement is valid, binding and enforceable against Bank in accordance with its terms and Bank has received all necessary corporate approvals and Bank is not required to obtain the approval of any Regulatory Authority to enter into this Agreement or perform its obligations hereunder.

(b)  Bank is a South Dakota chartered bank duly incorporated, validly existing, and in good standing under the laws of South Dakota.

(c)  Bank has the full power and authority to execute and deliver this Agreement and perform all of its obligations hereunder, save and except any limitations upon said power and authority applicable as a result of any state Rule requiring Bank to be licensed or registered within said state in order to originate and fund Program Loans.

(d)  The execution of this Agreement and the completion of all actions required or contemplated to be taken by Bank hereunder are within the ordinary course of Bank's business, and permitted by applicable law.

(e)  The provisions of this Agreement and the performance of each of its obligations hereunder do not conflict with Bank's Articles of Incorporation, Bylaws, or any agreement, contract, lease, or obligation to which Bank is a party or by which Bank is bound, including any exclusivity or other provisions of any other agreement to which Bank or any related entity is a party, and including any non-compete agreement or similar agreement limiting the right of Bank to engage in activities competitive with the business of any other party.

(f)  The Bank has the authority, save and except any applicable state Rule requiring Bank to be registered or licensed within said state in order to originate and fund Program Loans, to originate Program Loans to the Borrowers who meet the requirements established in the Program Guidelines. The Program Loans will be originated and disbursed by Bank and will conform with South Dakota law.

(g)  To the best knowledge of Bank, and as of the date of origination and sale of the Loans to CashCall, each Program Loan (i) meets the underwriting requirements as defined in the Program Manual; (ii) has not been satisfied, subordinated or rescinded, and no right of rescission, set-off, counterclaim or defense exists or has been asserted with respect to such Program Loan; and (iii) there is no action before any state or federal court, administrative or regulatory body involving any Program Loans in which an adverse result would have a material adverse effect upon the validity or enforceability of the Program Loans.

(h)  The Bank has the complete and unrestricted right and authority to sell, convey, assign, transfer and deliver to CashCall, all of the Program Loans being sold to CashCall pursuant to this Agreement, provided that such sale shall be without any

- 17 -

CASHCALL-WVAG 000024
CONFIDENTIAL

recourse to the Bank and without any representation or warranty on the part of the Bank, whether expressed or implied, except as set forth in the Agreement.

(i) The Bank is the sole owner and holder of each Program Loan to be purchased and on the sale of such Program Loan, CashCall will receive each Loan, free and clear of any liens, pledges or encumbrances created or incurred by Bank.

(j) At the time of the sale of the Loans to Cash Call, (i) each Program Loan was documented on forms set forth in the Program Manual, and (ii) each Program Loan was underwritten in substantial compliance with the Program Manual.

(k) On the date of the sale of each Program Loan to Cash Call, the proceeds of the Program Loan will have been fully disbursed.

(l) Neither Bank nor any principal thereof has been or is the subject of any of the following:

   (i) Criminal conviction;

   (ii) IRS lien;

   (iii) Enforcement agreement, memorandum of understanding, cease and desist order, administrative penalty, or similar agreement concerning lending matters, or participation in the affairs of a financial institution;

   (iv) Administrative or enforcement proceeding or investigation commenced by the Securities Exchange Commission, state securities regulatory authority, Federal Trade Commission, any banking regulator, or any other state or federal Regulatory Authority; or

   (v) Restraining order, decree, injunction, or judgment in any proceeding or lawsuit alleging fraud or deceptive practices or illegal activity on the part of Bank or any principal thereof.

For purposes of this subsection the word "principal" of Bank shall include (i) any person exercising Control over Bank, (ii) any officer or director of Bank, and (iii) any person actively participating in the control of Bank's business.

## ARTICLE XI. MISCELLANEOUS

Section 11.1   Indemnification.

(a) Indemnification by CashCall. Except to the extent of any Losses (as herein defined) which arise from the direct acts or omissions of Bank or an Affiliate of Bank, CashCall shall be liable to and shall indemnify and hold harmless Bank and its respective directors, officers, employees, agents and Affiliates and permitted

- 18 -

CASHCALL-WVAG 00002
CONFIDENTIAL

assigns from and against any and all "Losses" arising out of (i) any failure of CashCall to comply with any of the terms and conditions of this Agreement, (ii) the inaccuracy of any representation or warranty made by CashCall herein, (iii) any infringement or alleged infringement of any of the CashCall marks, the Advertising Materials, or Program Materials, or the use thereof hereunder, on the rights of any third party, (iv) any losses resulting from a failure of CashCall to comply, in respect of its obligations in connection with the Program hereunder, with any applicable Rules whether immaterial or material, regardless of whether such failure to comply would constitute a breach of a representation, warranty or covenant of CashCall hereunder, (vi) any claim that a Loan Document, the Program Materials, or the Advertising Materials, or any other aspect of the Program violate any applicable Rule, or (vii) any claims asserted by Borrowers in connection with the Program.

(b)     Indemnification by Bank.  Except to the extent of any Losses which arise from the direct acts or omissions of CashCall or an Affiliate of CashCall, Bank shall be liable to and shall indemnify and hold harmless CashCall and its respective officers, directors, employees, agents and Affiliates and permitted assigns, from and against any Losses arising out of (i) the failure of Bank to comply with any of the terms and conditions of this Agreement, (ii) the inaccuracy of any representation or warranty made by Bank herein, or (iii) any infringement or alleged infringement of any of the Bank marks, or the use thereof hereunder, on the rights of any third party.

(c)     Losses Defined.  For the purposes of this Agreement, the term "Losses" shall mean all out-of-pocket costs, damages, losses, fines, penalties, judgments, settlements, and expenses whatsoever, including, without limitation, (i) outside attorneys' fees and disbursements and court costs reasonably incurred by the indemnified party; and (ii) costs (including reasonable expenses and reasonable value of time spent) attributable to the necessity that any officer or employee (other than in-house attorneys) of any Indemnified Party spend more than 50% of his or her normal business hours, over a period of two (2) months, in connection with any judicial, administrative, legislative, or other proceeding.

(d)     Notice of Claims.  In the event any claim is made, any suit or action is commenced, or any knowledge of a state of facts that, if not corrected, would give rise to a right of indemnification of a party hereunder ("Indemnified Party") by the other party ("Indemnifying Party") is received, the Indemnified Party will give notice to the Indemnifying Party as promptly as practicable, but, in the case of lawsuit, in no event later than the time necessary to enable the Indemnifying Party to file a timely answer to the complaint.  The Indemnified Party shall make available to the Indemnifying Party and its counsel and accountants at reasonable times and for reasonable periods, during normal business hours, all books and records of the Indemnified Party relating to any such possible claim for indemnification, and each party hereunder will render to the other such assistance as it may reasonably require of the other (at the expenses of the party requesting

- 19 -

CASHCALL-WVAG 000
CONFIDENTIAL

assistance) in order to insure prompt and adequate defense of any suit, claim or proceeding based upon a state of facts which may give rise to a right of indemnification hereunder.

(e)   Defense and Counsel.  Subject to the terms hereof, the Indemnifying Party shall have the right to defend any suit, claim or proceeding.  The Indemnifying Party shall notify the Indemnified Party via facsimile transmission, with a copy by mail, within ten (10) days of having been notified pursuant to this Section 11.1(e) if the Indemnifying Party elects to employ counsel and assume the defense of any such claim, suit or action.  Any counsel retained by the Indemnifying Party for such purposes shall be reasonably acceptable to the Indemnified Party.  The Indemnifying Party shall institute and maintain any such defense diligently and reasonably and shall keep the Indemnified Party fully advised of the status thereof.  The Indemnified Party shall have the right to employ its own counsel if the Indemnified Party so elects to assume such defense, but the fees and expense of such counsel shall be at the Indemnified Party's expenses, unless (i) the employment of such counsel shall have been authorized in writing by the Indemnifying Party; (ii) such Indemnified Party shall have reasonably concluded that the interests of such parties are conflicting such that it would be inappropriate for the same counsel to represent both parties or shall have reasonably concluded that the ability of the parties to prevail in the defense of any claim are improved if separate counsel represents the Indemnified Party (in which case the Indemnifying Party shall not have the right to direct the defense of such action on behalf of the Indemnified Party), and in either of such events such reasonable fees and expenses shall be borne by the Indemnifying Party; (iii) the Indemnified Party shall have reasonably concluded that it is necessary to institute separate litigation, whether in the same or another court, in order to defend the claims asserted against it; (iv) the Indemnified Party reasonably concludes that the ability of the parties to prevail in the defense of any claim is materially improved if separate counsel represents the Indemnified Party; and (v) the Indemnifying Party shall not have employed counsel reasonably acceptable to the Indemnified Party to take charge of the defense of such action after electing to assume the defense thereof.

(f)   Settlement of Claims.  The Indemnifying Party shall have the right to compromise and settle any suit, claim or proceeding in the name of the Indemnified Party; provided, however, that the Indemnifying Party shall not compromise or settle a suit, claim or proceeding (i) unless it indemnifies the Indemnified Party for all Losses arising out of or relating thereto and (ii) with respect to any suit, claim or proceeding which seeks any non-monetary relief, without the consent of the Indemnified Party, which consent shall not be unreasonably withheld.  Any final judgment or decree entered on or in, any claim, suit or action which the Indemnifying Party did not assume the defense of in accordance herewith, shall be deemed to have been consented to by, and shall be binding upon, the Indemnifying Party as fully as if the Indemnifying Party had assumed the defense thereof and a final judgment or decree had been entered in such suit or action, or

- 20 -

CASHCALL-WVAG 000027
CONFIDENTIAL

with regard to such claim, by a court of competent jurisdiction for the amount of such settlement, compromise, judgment or decree. The Indemnifying Party shall be subrogated to any claims or rights of the Indemnified Party as against any other Persons with respect to any amount paid by the Indemnifying Party under this Section 11.1(f).

(g)   Indemnification Payments. Amounts owing under this Article XI shall be paid promptly upon written demand for indemnification containing in reasonable detail the facts giving rise to such liability, provided, however, that if the Indemnifying Party notifies the Indemnified Party within thirty (30) days of receipt of such demand that it disputes its obligation to indemnify and the parties are not otherwise able to reach agreement, the controversy shall be settled through arbitration as described in Section 11.2.

(h)   Survival. The terms of this Section 11.1 shall survive the termination or expiration of this Agreement.

Section 11.2   Governing Law; Arbitration. This Agreement shall be governed by and construed in accordance with the laws of the State of South Dakota without regard to its conflict of laws rules. At the request of either party, any dispute between the parties relating to this Agreement shall be submitted to binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association. The parties agree that any arbitration proceedings hereunder, unless otherwise agreed to by the parties, shall be conducted in the city of the home office of the party not commencing arbitration. Each party hereto consents to the jurisdiction over it by any court or arbitration panel as described herein.

In the event that a party initiates a lawsuit in court concerning an arbitrable claim, controversy or dispute, such party shall pay the other party for the costs, including attorneys' fees, that the other party incurs to obtain an order from the court to stay or dismiss the lawsuit or otherwise compel arbitration. The arbitrator shall be authorized to award such relief as is allowed by law. Except as provided below, each party shall be responsible for its own attorneys' fees incurred during the course of the arbitration, as well as the costs of any witnesses or other evidence such party produces or causes to be produced. The award of the arbitrator shall include findings of fact and conclusions of law. Such award shall be kept confidential, and shall be final, binding, and conclusive on the parties. Judgment on the award may be entered by any court of competent jurisdiction. The prevailing party in the resolution of any dispute ("Dispute Resolution") concerning this Agreement, any provision hereof or any actual or alleged breach shall be entitled to its reasonable attorneys' fees, including investigation and costs of discovery, and other costs connected with such Dispute Resolution, in addition to all other recovery or relief. The prevailing party shall be that party receiving substantially the relief sought or successfully defending substantially the position maintained in the Dispute Resolution, whether or not brought to final award or judgment.

Section 11.3   Third Party Service Providers. CashCall shall not, whether directly or indirectly, retain any Third Party Service Provider to assist it in performing its duties hereunder or to otherwise participate in the Program except with the prior written consent of Bank, which consent shall not be unreasonably withheld. In seeking the approval of Bank to retain a Third

CASHCALL-WVAG 0000
CONFIDENTIAL

Party Service Provider, CashCall shall provide to Bank such information concerning the proposed Third Party Service Provider as Bank may reasonably request. Bank may condition its willingness to approve a proposed Third Party Service Provider upon obtaining a written commitment from such Third Party Service Provider to comply with the terms of this Agreement and the Program Guidelines, submit to audits and inspections by Bank and any Regulatory Authority, and indemnify Bank upon such terms and conditions as Bank may reasonably require. CashCall shall be responsible for supervising any Third Party Service Providers retained by it and ensuring their compliance with this Agreement, the Program Guidelines, and the Rules.

Section 11.4   Confidential Information. In performing their obligations pursuant to this Agreement, each party may have access to and receive disclosure of certain confidential information about the other party or parties, including without limitation the names and addresses of a party's customers or members, marketing plans and objectives, research and test results, and other information which is confidential and the property of the party disclosing the information ("Confidential Information"). The parties agree that the term Confidential Information shall include this Agreement, the Program Guidelines, and the Program Materials, as the same may be amended and modified from time to time. Confidential Information shall not include information in the public domain or which is independently developed by the other party. Bank and CashCall agree that Confidential Information shall be used by each party solely in the performance of its obligations under this Agreement. Each party shall receive Confidential Information in confidence and shall not disclose Confidential Information to any third party, except as may be necessary to perform its obligations hereunder, as may be otherwise agreed in writing by the party furnishing the information, or as required by the Rules.

Upon request or upon any expiration or termination of this Agreement, each party shall return to the other party or destroy (as the latter may instruct) all of the latter's Confidential Information in the former's possession which is in any written or other recorded form, including data stored in any computer medium; provided, however, that a party may retain the Confidential Information of the other party (but subject to the requirements of the preceding paragraph) to the extent that such party needs access to such information to continue to perform any of its obligations hereunder or to service or administer Loans or otherwise perform obligations owed by such party to another party.

Section 11.5   Privacy Law Compliance; Security Breach Disclosure. Each party agrees that it shall obtain, use, and retain information concerning Borrowers and Applicants , including nonpublic personal information as defined under the Gramm-Leach-Bliley Act of 1999 ("Customer Information"), only in strict compliance with all applicable state and federal laws and regulations concerning the privacy and confidentiality of such information, including the requirements of the federal Gramm-Leach-Bliley Act of 1999, the regulations of the Federal Reserve Board set forth at 12 C.F.R. Part 216, and Bank's privacy policy. Each such party shall not disclose or use information concerning Borrowers or Applicants other than to carry out the purposes for which such information has been disclosed to it hereunder. Further, each Party shall require any Third Party Service Providers to maintain the confidentiality of said information in a similar fashion. Each Party shall not solicit Borrowers in connection with additional products or services without obtaining Bank's prior written consent, which shall not be withheld unreasonably. Each Party warrants that it has in place and employs appropriate

- 22 -

CASHCALL-WVAG 00002<br>CONFIDENTIAL

measures designed to meet the objectives of the security and confidentiality guidelines of the federal banking agencies' Interagency Guidelines Establishing Standards for Safeguarding Consumer Information and 12 C.F.R. Part 332, et. seq., adopted in connection with the federal Gramm-Leach-Bliley Act of 1999. Each Party shall promptly disclose to the other any breaches in security with respect to its operations, the identity or information regarding any Borrower or Applicant, or any breach relating to databases or information maintained by either party with respect to Loans, Borrowers, or Applicants. Each Party shall report to the other when any such material intrusion has occurred, the estimated effect of the intrusion on the other party, any Borrowers, and any Applicants; and the specific corrective actions taken or planned to be taken. In addition, Each Party agrees that it will not make any material changes to its security procedures and requirements affecting the performance of its obligations hereunder which would materially lessen the security of its operations or materially reduce the confidentiality of any databases and information maintained with respect to Bank, Borrowers, and Applicants without the prior written consent of the other Party.

Section 11.6   Force Majeure.   In the event that either party fails to perform its obligations under this Agreement in whole or in part as a consequence of events beyond its reasonable control (including, without limitation, acts of God, fire, explosion, public utility failure, accident, floods, embargoes, epidemics, war, terrorist acts, nuclear disaster or riot), such failure to perform shall not be considered a breach of this Agreement during the period of such disability. In the event of any force majeure occurrence as set forth in this Section, the disabled party shall use its best efforts to meet its obligations as set forth in this Agreement. The disabled party shall promptly and in writing advise the other party if it is unable to perform due to a force majeure event, the expected duration of such inability to perform and of any developments (or changes therein) that appear likely to affect the ability of that party to perform any of its obligations hereunder in whole or in part.

Section 11.7   Regulatory Examinations and Financial Information.   CashCall agrees to submit to any examination which may be required by any Regulatory Authority with audit and examination authority over Bank, to the fullest extent that such Regulatory Authority may require, and CashCall specifically agrees and acknowledges that it will be subject to examination by the FDIC to the same extent as Bank and to the fullest extent provided by law.

In addition, CashCall agrees to provide to Bank (i) quarterly unaudited financial statements for CashCall within forty-five (45) days following the end of each calendar quarter, and (ii) annual audited financial statements for CashCall and each Guarantor within one-hundred twenty (120) days following the end of each calendar year during the term hereof, except that in the case of any Guarantor who is a natural person such financial statements need not be audited. All such financial statements shall be prepared on a consolidated basis, to the extent applicable, and shall be prepared in accordance with generally accepted accounting principles consistently applied.

CashCall also agrees that Bank (either directly or by the use of accountants or other agents or representatives) may audit, inspect, and review CashCall and its files, records, and books which pertain to the services provided by CashCall or the duties and obligations of CashCall hereunder or to the creditworthiness of CashCall or which Bank may reasonably require in order to respond to any examination by or request from a Regulatory Authority.

- 23 -

CASHCALL-WVAG 00003(
CONFIDENTIAL

CashCall agrees to submit to Bank such information as Bank may from time to time reasonably request in order to ascertain CashCall's compliance with the requirements of this Agreement and compliance of the Program, CashCall, and Third Party Service Providers retained by CashCall with all applicable laws and regulations. The rights of Bank set forth in this Section shall also apply to any Third Party Service Provider and its files, records, and books, and CashCall agrees that any agreement it may enter into with a Third Party Service Provider shall so provide.

CashCall agrees to submit annually while this Agreement is in effect to a SAS 70 audit, at its sole expense, which will include as part of its scope, a review of electronic data processing functions, by an independent third party satisfactory to Bank and Regulatory Authorities having jurisdiction over Bank and to promptly submit the results of such audits to Bank. CashCall agrees that the engagement for the first such audit, which shall be a SAS 70 Type I audit, shall be completed within one hundred eighty (180) days after the Commencement Date, and the audit shall be commenced within thirty (30) days of the engagement date, and subsequent audits shall be completed annually thereafter. Following completion of the first annual SAS 70 audit, Bank may thereafter in its reasonable discretion require that subsequent audits consist of a SAS 70 Type II audit. CashCall agrees that Bank may communicate directly with the person or firm performing such audits and consents to such person or firm communicating directly with Bank concerning the results of such audits.

Section 11.8    Relationship of Parties; No Authority to Bind. Bank and CashCall agree they are independent contractors to each other in performing their respective obligations hereunder. Nothing in this Agreement or in the working relationship established and developed hereunder shall be deemed or is intended to be deemed, nor shall it cause, Bank and CashCall to be treated as partners, joint ventures, or otherwise as joint associates for profit.

Cash Call shall not have any authority with respect to the Program other than that expressly granted herein. No actions or failure to act on the part of Bank shall be construed to imply the existence of any authority not expressly granted herein. CashCall is not authorized to, and shall not make or amend any contract, incur any debt or liability, or extend any credit or enter into any obligation on behalf of Bank; modify or amend any Loan Document or other instrument received from Bank; extend the time for making any payment which may become due under any Loan Document prior to purchase of the Loan by CashCall; or waive any of Bank's rights or privileges under any agreement made by Bank or under Bank Policies and guidelines. CashCall will not directly or indirectly, in any manner whatsoever, offer or allow any customer or any other person any advantage which is not offered by Bank. CashCall understands and agrees that CashCall's name shall not appear on any Loan Document as a maker of a Loan and that Bank shall make all final underwriting decisions to make or provide a Loan or pertaining to the funding of a Loan. CashCall shall refer to Bank any inquiries concerning the accuracy, interpretation, or legal effect of any Loan Document. CashCall shall not negotiate the terms of any Loan Document on behalf of Bank prior to purchase of the Loan by CashCall. CashCall's responsibilities hereunder shall not constitute the "receipt" of the Loan Documents by Bank; instead, Bank shall be deemed to have received and reviewed the Loan Documents and supporting materials only after the Loan Documents and materials have been previously received at Bank's offices, at which time and place Bank shall decide whether to make the Loan. CashCall shall not represent to anyone that CashCall has the authority or power to do any of the

CASHCALL-WVAG 000031
CONFIDENTIAL

foregoing and shall make no representations concerning Bank's transactions except as expressly authorized in writing.

Bank shall not have any authority or control over any of the property interests or employees of CashCall.

Section 11.9    Exclusivity. Bank shall have the right to originate no less than ███████ ███████ of the total volume of loans, measured quarterly based on total dollar amount of loans, originated through CashCall's marketing of loans to be originated by banks ("Bank Model Loans"). For purposes of this section, the phrase "Bank Model Loans" shall not include any loan products marketed by CashCall that Bank has elected not to originate. Within ten (10) days from the end of each quarter, CashCall shall provide to Bank an accounting detailing the total dollar volume of Bank Model Loans originated during the prior quarter, the percentage of such Bank Model Loans originated by Bank, and the percentage of Bank Model Loans originated by any other bank or banks (the "Quarterly True Up"). In the event the Quarterly True Up demonstrates that Bank did not receive ███████████████ of the Bank Model Loans originated during the prior quarter, CashCall shall pay Bank a sum (the "True Up Payment") calculated as follows: If the total Bank Model Loans originated by Bank in the current contract year are, as of the date of the Quarterly True Up, less than ███████████ the True Up Payment shall be a sum equal to ███ ██████ of the difference between the amount of Bank Model Loans Bank would have originated if it had originated ███████████ of the Bank Model Loans and the amount of Bank Model Loans originated by Bank during the prior quarter. If the total Bank Model Loans originated by Bank in the current contract year are, as of the date of the Quarterly True Up, more than ███████████ but less than ███████████ the True Up Payment shall be a sum equal to ████ ██████████████████ of the difference between the amount of the Bank Model Loans Bank would have originated if it had originated ███████████ of the Bank Model Loans and the amount of Bank Model Loans originated by Bank during the prior quarter. If the total Bank Model Loans originated by Bank in the current contract year are, as of the date of the Quarterly True Up, equal to or greater than ███████████ the True Up Payment shall be a sum equal to ████████████████████ of the difference between the amount of the Bank Model Loans Bank would have originated if it had originated ███████████ of the Bank Model Loans and the amount of Bank Model Loans originated by Bank during the prior quarter. CashCall shall pay to Bank any True Up Payment owed as demonstrated in any Quarterly True Up within 5 days from delivery of the Quarterly True Up. CashCall shall disclose Bank's rights under this paragraph to any subsequent bank with which CashCall intends to enter into an agreement in connection with the marketing and origination of Bank Model Loans. CashCall acknowledges and agrees that Bank and its affiliates may also enter into similar relationships with other parties marketing national consumer loan products to be originated by Bank or its affiliates so long as Bank does not disclose any Confidential Information of CashCall (as defined in Section 11.4) in connection with any such programs.

Section 11.10    Compliance with Credit Facility. During the term hereof, Cash Call shall satisfy, and remain in compliance with the provisions of any Credit Facility, including all financial covenants, dividend restrictions, and provisions of any kind set forth therein. Cash Call shall execute such further documents as may be necessary to authorize the Bank or financial

- 25 -

CASHCALL-WVAG 000032
CONFIDENTIAL

institution providing any Credit Facility to share all information and files regarding the Credit Facility with Bank.

Section 11.11 Severability. In the event that any part of this Agreement is ruled by a court, Regulatory Authority, or other public or private tribunal of competent jurisdiction to be invalid or unenforceable, such provision shall be deemed to have been omitted from this Agreement. The remainder of this Agreement shall remain in full force and effect, and shall be modified to any extent necessary to give such force and effect to the remaining provisions, but only to such extent. In addition, if the operation of the Program or the compliance by a party with its obligations set forth herein causes or results in a violation of a Rule, the parties agree to negotiate in good faith to modify the Program or this Agreement as necessary in order to permit the parties to continue the Program in full compliance with all Rules.

Section 11.12 Successors and Third Parties. This Agreement and the rights and obligations hereunder shall bind and inure to the benefit of the parties hereto and their successors and assigns. The rights and benefits hereunder are specific to the parties and shall not be delegated or assigned without the prior written consent of the other party. Nothing in this Agreement is intended to create or grant any right, privilege, or other benefit to or for any person or entity other than the parties hereto. Notwithstanding the foregoing, Bank may assign this Agreement and its rights hereunder without CashCall's consent to any purchaser or acquirer of Bank or any successor to Bank by reason of any merger, consolidation, or sale of assets, and Bank may delegate its responsibilities and assign its rights hereunder in its discretion to an Affiliate (as defined in 12 U.S.C. § 371c) of Bank.

Section 11.13 Notices. All notices, requests, and approvals required or permitted by this Agreement shall be in writing and addressed/directed to the other party at the address/telefacsimile number below or at such other address of which the notifying party hereafter receives notice in conformity with this Section. All such notices, requests, and approvals shall be deemed given upon the earlier of facsimile transmission or actual receipt thereof:

To Bank:

First Bank & Trust of Milbank
c/o First Community Financial
520 Sixth Street
Brookings, SD  57006-5057
Attention:  Trent Sorbe
Facsimile No.: (605) 696-2183

With copy to:

Keith A. Gauer
Davenport, Evans, Hurwitz & Smith, L.L.P.
206 West 14th Street
P.O. Box 1030
Sioux Falls, SD  57101-1030
Facsimile No.: (605) 335-3639

- 26 -

CASHCALL-WVAG 0000
CONFIDENTIAL

To CashCall:           CashCall, Inc.
                            17360 Brookhurst Street
                            Fountain Valley, California 92708
                            Attention: Dan Baren
                            Facsimile No.: 949-225-4605

Section 11.14 <u>Waiver</u>.  Neither party shall be deemed to have waived any of its rights, powers, or remedies hereunder except in an express writing signed by an authorized agent or representative of the party to be charged.

Section 11.15 <u>Counterparts</u>.  This Agreement may be executed and delivered by the parties hereto in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

Section 11.16 <u>Specific Performance</u>.  Certain rights which are subject to this Agreement are unique and are of such a nature as to be inherently difficult or impossible to value monetarily. In the event of a breach of this Agreement by either party, an action at law for damages or other remedies at law would be inadequate to protect the unique rights and interests of the parties. Accordingly, the terms of this Agreement shall be enforceable in a court of equity by a decree of specific performance or injunction. Such remedies shall, however, be cumulative and not be exclusive and shall be in addition to any other remedy which the parties may have.

Section 11.17 <u>Further Assurances</u>.  From time to time, the parties will execute and deliver to the other such additional documents and will provide such additional information as either may reasonably require to carry out the terms of this Agreement.

Section 11.18 <u>Entire Agreement</u>.  This Agreement, and the documents executed and delivered pursuant hereto, constitute the entire agreement between the parties, and may be amended or modified only by a writing signed by duly authorized representatives of each party and dated subsequent to the date hereof.  This Agreement shall supersede and merge all prior communications, representations, or agreements, either oral or written, between the parties hereto with respect to the subject matter hereof, except where survival of prior written agreements is expressly provided for herein.

Section 11.19  <u>Restriction on Use of Certain Information.</u>  Bank hereby agrees not to use, sell or transfer any list of Borrowers or Applicants derived from the Program, without the prior written consent of CashCall, except as required by the Bank to comply with the Rules.

CASHCALL-WVAG 000034
CONFIDENTIAL

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date set forth above.

FIRST BANK & TRUST OF MILBANK

By: _Ken A_____

Its _President_____

CASHCALL, INC.

By: _____

Its _____

- 28 -

CASHCALL-WVAG 000035
CONFIDENTIAL

LORA found on FAX - (3rd PARTY -)

800- 368- 8806   faxed

# NOTICE OF FIELD VISIT

Brenda Baylous
Cabbell Huntington Hospital
1340 Holl Greer Blvd
Huntington West Virginia 25701

RE: Loan # 684820

Date: January 7, 2008

Dear Brenda Baylous,

THIS MEMO IS HERE TO NOTIFY YOU THAT CASHCALL, INC. HAS SENT A FIELD REPRESENTATIVE TO MEET WITH YOU AT YOUR PLACE OF EMPLOYMENT DUE TO YOUR FAILURE TO RETURN OUR CALLS OR RESPOND TO ANY OF OUR OTHER ATTEMPTS TO CONTACT YOU. THE COST OF THIS FIELD VISIT MAY RANGE FROM $55.00 TO $150.00 DEPENDING ON YOUR LOCATION, AND YOU MAY BE CHARGED FOR THIS AND ANY OTHER SUBSEQUENT FIELD VISITS.

In light of these facts, we can only conclude that you have no intention of repaying any amount due under the CashCall Agreement and Disclosure Statement.  If this is not the case, please contact me immediately to discuss your account.

If you fail to make a payment via MONEY GRAM within 24 hours from the date of this letter, we will demand the entire balance outstanding under the terms of your loan agreement.

This communication is an attempt to collect a debt and any information obtained will be used for that purpose.

Sincerely,

Arbitration Dept. of CashCall, Inc.

EXHIBIT
F

January 7, 2007

To Whom It May Concern:

On this date, while working in the general work area of Cabell Huntington Hospital Registration, I received a fax addressed to Brenda Baylous concerning a "Notice of Field Visit".  It was received in an area for any or all employees to view.


Sincerely,

*Lora Grizzell.*

Lora Grizzell
Registration Clerk
Cabell Huntington Hospital
304-526-2080

EXHIBIT
G

January 7, 2007

To Whom It May Concern:

On this date, while working in the general work area of Cabell Huntington Hospital Registration, I saw a fax addressed to Brenda Baylous concerning a "Notice of Field Visit". It was received in an area for any or all employees to view.

Sincerely,

Kimberly Taylor
Registration Clerk
Cabell Huntington Hospital
304-526-2080

EXHIBIT
H



RECEIVED

AUG 2 1 2008

ATTORNEY
GENERAL'S OFFICE

P.O. Box 66007 Anaheim, CA 92816                                  (866) 899-1844

# Notice of Intent to Initiate Arbitration Claim

EDWARD BELCHER                          Date   August 15, 2008
4235 SISSONVILLE DR 0
CHARLESTON, WV 25312


                    Account Number   1030374
                    Outstanding Balance   $5,566.73

This letter shall serve as CashCall, Inc.'s formal notification that it intends to commence an arbitration claim against you based on your default of your loan with First Bank & Trust, which is currently owned and serviced by CashCall.

Pursuant to the Arbitration Section of your Promissory Note and Disclosure Statement, CashCall will submit a Demand for Arbitration in which it will seek an award for the entire unpaid balance, along with all accrued interest and any outstanding fees owed to CashCall unless you contact CashCall within seven business days to make arrangements to pay this debt. If you would like another copy of the arbitration section of your Promissory Note, please contact us at the number below.

Please be advised that CashCall will be entitled to obtain a judgment against you and pursue your personal assets in the event it prevails in the arbitration proceeding.

Please take this opportunity to resolve this issue in an amicable fashion.


Regards,


CashCall

866-899-1844


EXHIBIT
I

*This communication is an attempt to collect a debt and any information obtained will be used for that purpose. As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.*





P.O. Box 66007 Anaheim, CA 92816                                         (866) 899-1844

## <u>Notice of Arbitration Proceedings</u>

EDWARD BELCHER                                    Date    August 21, 2008
4235 SISSONVILLE DR 0
CHARLESTON, WV 25312

                                            Account Number    1030374
                                            Claim Balance     $5,566.73

This letter is to serve to confirm that CashCall, Inc. shall initiate arbitration proceedings
against you on your defaulted loan in 10 days unless we can resolve the matter before that
time. The above-referenced account is in default and has been assigned to the arbitration
division of CashCall. A claim will be made for the above-referenced balance and
additional charges recoverable under the arbitration agreement.  You are hereby given
notice pursuant to the National Arbitration Forum's code of procedure that this account
will be submitted to arbitration based on your breach of the Promissory Note and
Disclosure Statement.

Formal Notification:

You and CashCall both agreed to proceed to arbitration to settle any disputes regarding
your account. You are hereby notified that copies of your Arbitration Agreement and this
demand for Arbitration will be filed with National Arbitration Forum at the following
address:

                    National Arbitration Forum
                          P.O. Box 50191
                     Minneapolis, MN 55405-0191

To contact NAF by telephone call (800) 474-2371 or use email info@adrforum.com.

*A copy of the arbitration clause is listed below.

Please take this opportunity to resolve this issue in an amicable fashion.  We will file this
claim if this matter is not resolved in 10 days.

Regards,

CashCall Arbitration Division

Toll Free 866-899-1844

EXHIBIT
J

*This communication is an attempt to collect a debt and any information obtained will be
used for that purpose. As required by law, you are hereby notified that a negative credit
report reflecting on your credit record may be submitted to a credit reporting agency if
you fail to fulfill the terms of your credit obligations.*



P.O. Box 66007 Anaheim, CA 92816                    (866) 899-1844

<u>Arbitration Clause</u>

**ARBITRATION. PLEASE READ THIS PROVISION OF THE AGREEMENT
CAREFULLY. I UNDERSTAND THAT UNLESS I EXERCISE THE RIGHT TO
OPT-OUT OF ARBITRATION IN THE MANNER DESCRIBED BELOW, I
AGREE THAT ANY DISPUTE WILL BE RESOLVED BY BINDING
ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT,
INCLUDING THE RIGHT TO HAVE A JURY, TO ENGAGE IN DISCOVERY
(EXCEPT AS MAY BE PROVIDED IN THE ARBITRATION RULES), AND TO
PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. IN
ARBITRATION, A DISPUTE IS RESOLVED BY AN ARBITRATOR INSTEAD
OF A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND
MORE LIMITED THAN COURT PROCEDURES. I ALSO AGREE ANY
ARBITRATION WILL BE LIMITED TO THE DISPUTE BETWEEN MYSELF
AND YOU OR THE HOLDER OF THE NOTE AND WILL NOT BE PART OF A
CLASS-WIDE OR CONSOLIDATED ARBITRATION PROCEEDING.**

**Agreement to Arbitrate.** The parties agree that any Dispute, except as provided below,
will be resolved by Arbitration. This agreement is governed by the Federal Arbitration
Act (FAA), 9 U.S.C.S. 1 et seq. and the substantive law of the State of South Dakota
(without applying its choice-of-law rules).

**Arbitration Defined.** Arbitration is a means of having an independent third party resolve
a Dispute. A "Dispute" is any controversy or claim between me and First Bank & Trust
or the Holder of the Note. The term Dispute is to be given its broadest possible meaning
and includes, without limitation, all claims or demands (whether past, present, or future,
including events that occurred prior to the opening of this Account), based on any legal or
equitable theory (tort, contract, or otherwise), and regardless of the type of relief sought
(i.e. money, injunctive relief, or declaratory relief). A Dispute includes, by way of
example and without limitation, any claim based upon marketing or solicitations to obtain
the loan and the handling of my account whether such Dispute is based on a federal or
state constitution, statute, ordinance, regulation, or common law, and including any issue
concerning the validity, enforceability, or scope of this arbitration agreement.

For purposes of this arbitration agreement, the term the "Holder" shall include First Bank
& Trusts employees, officers, directors, attorneys, affiliated companies, predecessors, and
assigns, as well as any marketing, servicing, and collection representatives and agents.

**Choice of Arbitrator.** The party filing an arbitration must choose either of the following
arbitration firms for initiating and pursuing an arbitration: the American Arbitration
Association or the National Arbitration Forum. If I claim I have a Dispute with the
Holder, but I fail to initiate an arbitration or select an arbitrator, the Holder may do so. I

*This communication is an attempt to collect a debt and any information obtained will be
used for that purpose. As required by law, you are hereby notified that a negative credit
report reflecting on your credit record may be submitted to a credit reporting agency if
you fail to fulfill the terms of your credit obligations.*



P.O. Box 66007 Anaheim, CA 92816                          (866) 899-1844

may obtain copies of the current rules of each of the arbitration firms and forms and instructions for initiating an arbitration by contacting them as follows:

American Arbitration Association
335 Madison Avenue, Floor 10
New York, NY 10017-4605
Website: www.adr.org

National Arbitration Forum
P.O. Box 50191
Minneapolis, MN 55405
Website: www.arbitration-forum.com

The policies and procedures of the selected arbitration firm will apply provided that these are consistent with this arbitration agreement. To the extent the arbitration firms rules or procedures are different than the terms of this arbitration agreement, the terms of this agreement will apply.

**Cost of Arbitration.** I understand that you will pay the filing fee and any costs or fees charged by the arbitrator regardless of which party initiates the arbitration. Except where otherwise provided by applicable law, each party will be responsible for its own attorneys fees and other expenses. Unless prohibited by law, the arbitrator may award fees, costs, and reasonable attorneys fees to the party who substantially prevails in the arbitration.

**Place of Arbitration.** Unless the parties agree to a different location, the arbitration will be held in the same city as the U.S. District Court closest to my then current mailing address.

**Waiver of Rights.** I understand that I am waiving my right to a jury trial, to have a court decide my Dispute, to participate in a class action lawsuit, and to certain discovery and other procedures that are available in a lawsuit. The arbitrator has the ability to award all remedies available by statute, at law, or in equity to the prevailing party, except that the parties agree that the arbitrator has no authority to conduct class-wide proceedings and will be restricted to resolving the individual disputes between the parties. The validity, effect, and enforceability of this waiver of class action lawsuit and class-wide arbitration is to be determined solely by a court of competent jurisdiction and not by the arbitration firm or arbitrator. If the court refuses to enforce the class-wide arbitration waiver, or if an arbitration firm or arbitrator fails or refuses to enforce the waiver of class-wide arbitration, the parties agree that the Dispute will proceed in court and will be decided by a judge, sitting without a jury, under applicable court rules and procedures.

**Applicable Law and Judicial Review.** The arbitrator will apply applicable federal and

*This communication is an attempt to collect a debt and any information obtained will be used for that purpose. As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.*



P.O. Box 66007 Anaheim, CA 92816                          (866) 899-1844

South Dakota substantive law and the terms of this Agreement. The arbitrator must apply the terms of this arbitration agreement, including without limitation the waiver of class-wide arbitration. The arbitrator will make written findings and the arbitrators award may be filed with any court having jurisdiction. The arbitration award will be supported by substantial evidence and must be consistent with this Agreement and applicable law or may be set aside by a court upon judicial review. Either party may seek judicial review of the arbitrators decision according to applicable law.

**Other Provisions.** This arbitration provision will survive: (i) termination or changes in this Agreement, the Account, or the relationship between us concerning the Account; (ii) the bankruptcy of any party; and (iii) any transfer, sale or assignment of my Note, or any amounts owed on my account, to any other person or entity.

**Right to Opt Out.** I understand that if I do not wish my account to be subject to this Arbitration Agreement, I must advise you in writing at P.O. Box 8040, Brookings, South Dakota 57006. I understand I must clearly print or type my name and account number and state that I reject arbitration. I understand that I must give written notice, and it is not sufficient to telephone you. I understand that you must receive my letter at the above address within sixty (60) days after the date my loan funds or my rejection of arbitration will not be effective.

*This communication is an attempt to collect a debt and any information obtained will be used for that purpose. As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.*

```
********************
***   RX REPORT   ***
********************


RECEPTION OK

TX/RX NO              7718
CONNECTION TEL
SUBADDRESS
CONNECTION ID
ST. TIME             08/26 11:34
USAGE T              02'06
PGS.                    4
RESULT               OK
```



*ATT NORMAN*
*GOOGLE*

P.O. Box 66007 Anaheim, CA 92816                    (866) 899-1844

# Notice of Arbitration Proceedings

LARRY FRAZIER                                    Date  FEB 2 6 2008
2951 ROUTE 75 ST Lot 1                                 February 19, 2008
HUNTINGTON, WV 25704

ATTORNEY GENERAL'S OFFICE

Account Number   1152551
Claim Balance    $2,972.38

This letter is to serve to confirm that CashCall, Inc. shall initiate arbitration proceedings against you on your defaulted loan in 10 days unless we can resolve the matter before that time. The above-referenced account is in default and has been assigned to the arbitration division of CashCall. A claim will be made for the above-referenced balance and additional charges recoverable under the arbitration agreement.  You are hereby given notice pursuant to the National Arbitration Forum's code of procedure that this account will be submitted to arbitration based on your breach of the Promissory Note and Disclosure Statement.

Formal Notification:

You and CashCall both agreed to proceed to arbitration to settle any disputes regarding your account. You are hereby notified that copies of your Arbitration Agreement and this demand for Arbitration will be filed with National Arbitration Forum at the following address:

National Arbitration Forum
P.O. Box 50191
Minneapolis, MN 55405-0191

To contact NAF by telephone call (800) 474-2371 or use email info@adrforum.com.

*A copy of the arbitration clause is listed below.

Please take this opportunity to resolve this issue in an amicable fashion.  We will file this claim if this matter is not resolved in 10 days.

Regards,

CashCall Arbitration Division

Toll Free 866-899-1844

EXHIBIT
K

*This communication is an attempt to collect a debt and any information obtained will be used for that purpose. As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.*



P.O. Box 66007 Anaheim, CA 92816                          (866) 899-1844

## Arbitration Clause

**ARBITRATION. PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY. I UNDERSTAND THAT UNLESS I EXERCISE THE RIGHT TO OPT-OUT OF ARBITRATION IN THE MANNER DESCRIBED BELOW, I AGREE THAT ANY DISPUTE WILL BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO HAVE A JURY, TO ENGAGE IN DISCOVERY (EXCEPT AS MAY BE PROVIDED IN THE ARBITRATION RULES), AND TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. IN ARBITRATION, A DISPUTE IS RESOLVED BY AN ARBITRATOR INSTEAD OF A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN COURT PROCEDURES. I ALSO AGREE ANY ARBITRATION WILL BE LIMITED TO THE DISPUTE BETWEEN MYSELF AND YOU OR THE HOLDER OF THE NOTE AND WILL NOT BE PART OF A CLASS-WIDE OR CONSOLIDATED ARBITRATION PROCEEDING.**

**Agreement to Arbitrate.** The parties agree that any Dispute, except as provided below, will be resolved by Arbitration. This agreement is governed by the Federal Arbitration Act (FAA), 9 U.S.C.S. 1 et seq. and the substantive law of the State of South Dakota (without applying its choice-of-law rules).

**Arbitration Defined.** Arbitration is a means of having an independent third party resolve a Dispute. A "Dispute" is any controversy or claim between me and First Bank & Trust or the Holder of the Note. The term Dispute is to be given its broadest possible meaning and includes, without limitation, all claims or demands (whether past, present, or future, including events that occurred prior to the opening of this Account), based on any legal or equitable theory (tort, contract, or otherwise), and regardless of the type of relief sought (i.e. money, injunctive relief, or declaratory relief). A Dispute includes, by way of example and without limitation, any claim based upon marketing or solicitations to obtain the loan and the handling of my account whether such Dispute is based on a federal or state constitution, statute, ordinance, regulation, or common law, and including any issue concerning the validity, enforceability, or scope of this arbitration agreement.

For purposes of this arbitration agreement, the term the "Holder" shall include First Bank & Trusts employees, officers, directors, attorneys, affiliated companies, predecessors, and assigns, as well as any marketing, servicing, and collection representatives and agents.

**Choice of Arbitrator.** The party filing an arbitration must choose either of the following arbitration firms for initiating and pursuing an arbitration: the American Arbitration Association or the National Arbitration Forum. If I claim I have a Dispute with the Holder, but I fail to initiate an arbitration or select an arbitrator, the Holder may do so. I may obtain copies of the current rules of each of the arbitration firms and forms and instructions for initiating an arbitration by contacting them as follows:

American Arbitration Association
335 Madison Avenue, Floor 10
New York, NY 10017-4605
Website: www.adr.org

National Arbitration Forum
P.O. Box 50191
Minneapolis, MN 55405
Website: www.arbitration-forum.com

*This communication is an attempt to collect a debt and any information obtained will be used for that purpose. As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.*



**P.O. Box 66007 Anaheim, CA 92816**                                    (866) 899-1844

The policies and procedures of the selected arbitration firm will apply provided that these are consistent with this arbitration agreement. To the extent the arbitration firms rules or procedures are different than the terms of this arbitration agreement, the terms of this agreement will apply.

**Cost of Arbitration.** I understand that you will pay the filing fee and any costs or fees charged by the arbitrator regardless of which party initiates the arbitration. Except where otherwise provided by applicable law, each party will be responsible for its own attorneys fees and other expenses. Unless prohibited by law, the arbitrator may award fees, costs, and reasonable attorneys fees to the party who substantially prevails in the arbitration.

**Place of Arbitration.** Unless the parties agree to a different location, the arbitration will be held in the same city as the U.S. District Court closest to my then current mailing address.

**Waiver of Rights.** I understand that I am waiving my right to a jury trial, to have a court decide my Dispute, to participate in a class action lawsuit, and to certain discovery and other procedures that are available in a lawsuit. The arbitrator has the ability to award all remedies available by statute, at law, or in equity to the prevailing party, except that the parties agree that the arbitrator has no authority to conduct class-wide proceedings and will be restricted to resolving the individual disputes between the parties. The validity, effect, and enforceability of this waiver of class action lawsuit and class-wide arbitration is to be determined solely by a court of competent jurisdiction and not by the arbitration firm or arbitrator. If the court refuses to enforce the class-wide arbitration waiver, or if an arbitration firm or arbitrator fails or refuses to enforce the waiver of class-wide arbitration, the parties agree that the Dispute will proceed in court and will be decided by a judge, sitting without a jury, under applicable court rules and procedures.

**Applicable Law and Judicial Review.** The arbitrator will apply applicable federal and South Dakota substantive law and the terms of this Agreement. The arbitrator must apply the terms of this arbitration agreement, including without limitation the waiver of class-wide arbitration. The arbitrator will make written findings and the arbitrators award may be filed with any court having jurisdiction. The arbitration award will be supported by substantial evidence and must be consistent with this Agreement and applicable law or may be set aside by a court upon judicial review. Either party may seek judicial review of the arbitrators decision according to applicable law.

**Other Provisions.** This arbitration provision will survive: (i) termination or changes in this Agreement, the Account, or the relationship between us concerning the Account; (ii) the bankruptcy of any party; and (iii) any transfer, sale or assignment of my Note, or any amounts owed on my account, to any other person or entity.

**Right to Opt Out.** I understand that if I do not wish my account to be subject to this Arbitration Agreement, I must advise you in writing at P.O. Box 8040, Brookings, South Dakota 57006. I understand I must clearly print or type my name and account number and state that I reject arbitration. I understand that I must give written notice, and it is not sufficient to telephone you. I understand that you must receive my letter at the above address within sixty (60) days after the date my loan funds or my rejection of arbitration will not be effective.

*This communication is an attempt to collect a debt and any information obtained will be used for that purpose. As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.*

```
                    ********************
                    ***   RX REPORT   ***
                    ********************


        RECEPTION OK

        TX/RX NO              9802
        CONNECTION TEL                   4296934
        SUBADDRESS
        CONNECTION ID
        ST. TIME             02/26 11:50
        USAGE T              00'55
        PGS.                     3
        RESULT               OK
```