# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### AT CHARLESTON

**STATE OF WEST VIRGINIA ex rel.
DARRELL V. MCGRAW, JR.,
ATTORNEY GENERAL,**

      **Plaintiff,**

**v.**                                                      **Civil Action No.: 2:08-cv-01292**
                                                            **Judge Joseph R. Goodwin**

**CASHCALL, INC., and
J. PAUL REDDAM, in his capacity as
President and CEO of CashCall, Inc.,**

      **Defendants.**


## STATE'S MEMORANDUM OF LAW IN
## <u>SUPPORT OF MOTION TO REMAND</u>


Respectfully submitted,

STATE OF WEST VIRGINIA
ex rel. DARRELL V. McGRAW, JR.,
Attorney General, Plaintiff,

By Counsel


<u>/s/ NORMAN GOOGEL #1438</u>
nag@wvago.gov
Consumer Protection/Antitrust Division
812 Quarrier Street
L&S Building, First Floor
Charleston, West Virginia 25301
(304) 558-8986

**TABLE OF CONTENTS**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ........................ 1

II.   REMOVAL BASED ON FEDERAL QUESTION JURISDICTION
      IS IMPROPER BECAUSE NO CLAIMS IN THE STATE'S
      COMPLAINT "ARISE UNDER" THE LAWS OF THE UNITED STATES ......... 1

III.  STATE'S CLAIM THAT CASHCALL IS THE "DE FACTO" LENDER
      DOES NOT PRESENT A FEDERAL QUESTION FOR
      REMOVAL PURPOSES ................................................. 5

      A.    CashCall Has Sough t to Evade West Virginia Usury and
            Consumer Protection Laws by Making Installment Loans over
            the Internet and by Partnering with State-Chartered Banks. ................. 5

      B.    Federal Courts Have Repeatedly Found no Federal Preemption
            and Granted Remands when State Regulators Challenged Rent-a
            Bank Schemes of Payday Lenders ..................................... 6

      C.    The Determination of Whether CashCall is the De Facto Lender
            Requires Elevation of Substance Over Form. .......................... 14

IV.   THE OCC AND THE FDIC HAVE ACTED TO END THE UNSAVORY,
      UNSAFE AND UNSOUND PARTNERING OF THE BANKS IT
      REGULATES WITH THIRD PARTY AGENTS LIKE CASHCALL THAT
      SEEK TO EVADE STATE USURY LAW  .................................. 16

V.    CONCLUSION ..................................................... 20

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

Bankwest, Inc. v. Baker,
    411 F.3d 1289 (11th Cir. 2005) ................................................................. 11

Bankwest, Inc. v. Baker,
    446 F.3d 1358 (11th Cir.2006) ................................................................. 12

Caterpillar, Inc. v. Williams,
    482 U.S. 386 (1987) ................................................................................... 2

Discover Bank v. Vaden,
    489 F.3d 594 (4th Cir.2007) ........................................................... 12, 13, 14

Flowers v. EZPawn Oklahoma,Inc.
    307 F. Supp. 2d 1191 (N.D. Ok. 2004) ................................................. 9, 10

Franchise Tax Board v. Construction Laborers Vacation Trust,
    463 U.S. 1 (1983) ....................................................................................... 2

Goleta National Bank v. Lingerfelt,
    211 F. Supp. 2d 711 (E.D.N.C. 2002) .................................................... 6, 7

Goleta National Bank v. O'Donnell,
    239 F. Supp. 2d 745 (S.D. Oh. 2002) ..................................................... 7, 8

Krispin v. May Department Stores Co.,
    218 F.3d 919 (8th Cir.2000) ...................................................................... 9

Marquette National Bank of Minneapolis v. First of Omaha Service Corporation,
    439 U.S. 299 (1978) ................................................................................... 3

Marshall v. Manville Sales Corp.,
    6 F.3d 229 ................................................................................................. 1

Merrell Dow Pharmaceuticals, Inc. V. Thompson,
    478 U.S. 804 (1986) ................................................................................... 2

Moore v. Chesapeake & Ohio Railway Co.,
    291 U.S. 205 (1934) ................................................................................... 2

Rice v. Exxon Corp.,
    631 F. Supp. 1522 (S.D.W.V. 1986) .................................................................. 2

Scott v. S.F. Greiner,
    858 F. Supp. 607 (S.D.W.V. 1994) .................................................................... 2

Shamrock Oil & Gas Corp. v. Sheets,
    313 U.S. 100 (1941) ......................................................................................... 1

Spaulding v. Mingo County Board of Education,
    897 F. Supp. 284 (S.D.W.V. 1995) .................................................................... 3

State of Colorado ex rel. Salazar v. Ace Cash Express, Inc.,
    188 F. Supp. 2d 1282 (D.Colo. 2002) ......................................................... 9, 10

Wilson v. Republic Iron & Steel Co.,
    257 U.S. 92 (1921) ........................................................................................... 1

## STATE CASES

Austin v. Alabama Check Casher's Association,
    936 So. 2d 1014 (Ala. 2006) ..................................................................... 14, 15

## FEDERAL STATUTES

12 U.S.C. §§ 1813(r) ............................................................................................ 12

28 U.S.C. § 1331 .................................................................................................... 1

NBA, 12 U.S.C. §§ 21 ............................................................................................ 9

## STATE STATUTES

W. Va. Code § 46A-6C-2(a)(2) ............................................................................. 7

Ga. Code. Ann. § 16-17-2(b)(4) ........................................................................... 11

## MISCELLANEOUS

Keest & Rennart, The Cost of Credit, § 3.13.3 (3d ed. & Supp. 2008) ............................ 4, 17, 18

OCC's Amicus Brief, State ex rel Salazar v. ACE Cash Express,
    Clearinghouse No. 53, 556 (D. Colo. Jan. 25, 2002) ...................................... 17

<u>See</u> In the Matter of First Bank of Delaware, Wilmington, Delaware, FDIC-07-256b, FDIC-07-256k, Order to Cease and Desist, Order for Restitution, and Order to Pay (entered Oct. 3, 2008) ............................................................................................. 19

<u>See</u> In the Matter of First Bank of Delaware, Wilmington, Delaware, FDIC-07-256b, FDIC-07-256k, Stipulation and Consent to the Issuance of an Order to Cease and Desist, Order for Restitution, and Order to Pay (entered Oct. 9, 2008) ................................................... 19

## STATE'S MEMORANDUM OF LAW IN
## SUPPORT OF MOTION TO REMAND

The State hereby files this memorandum of law in support of its motion to remand the above

civil action to the Circuit Court of Kanawha County as follows:

### I.   INTRODUCTION AND SUMMARY OF ARGUMENT

CashCall's removal was improper because the State's complaint does not raise a federal

question within the meaning of 28 U.S.C. § 1331 such as would confer original federal court

jurisdiction over this matter.  A review of the state's complaint ("Complaint") discloses that the

Plaintiff ("the State" or "Attorney General") only asserted <u>state</u> claims against CashCall, Inc.

("CashCall") and its principal officer.   CashCall is <u>not</u> a bank, and the State did not assert any

claims against a bank.  In order to justify federal court removal, CashCall seeks to rewrite the State's

well-pleaded complaint and convert it into a suit against a bank so that CashCall can now attempt

to shield itself under the federal preemption status of a bank that is not a party to this case.  As will

be discussed in more detail herein below, the State's claims are not preempted and this case must

be remanded to state court.

### II.   REMOVAL BASED ON FEDERAL QUESTION JURISDICTION IS
   IMPROPER BECAUSE NO CLAIMS IN THE STATE'S COMPLAINT
   "ARISE UNDER" THE LAWS OF THE UNITED STATES.

As a threshold matter, it is well settled that the burden of establishing federal jurisdiction is

on the party seeking removal.  <u>Wilson v. Republic Iron & Steel Co.</u>, 257 U.S. 92 (1921).  Further,

courts should strictly construe removal statutes and resolve all doubts about the propriety of removal

in favor of retained state court jurisdiction.  <u>Shamrock Oil & Gas Corp. v. Sheets</u>, 313 U.S. 100

(1941); <u>Marshall v. Manville Sales Corp.</u>, 6 F.3d 229, 232 4th Cir. 1993).

1

Federal question jurisdiction extends to "only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." Franchise Tax Board v. Construction Laborers Vacation Trust, 463 U.S. 1, 27-28 (1983) (emphasis added).   The mere presence of a federal issue in a state cause of action does not automatically confer federal question jurisdiction. Id. at 13-14.  See also Moore v. Chesapeake & Ohio Ry. Co., 291 U.S. 205, 214-15 (1934); Merrell Dow Pharmaceuticals, Inc. V. Thompson, 478 U.S. 804, 813-14 (1986).

The presence or absence of federal question jurisdiction is governed by the "well-pleaded complaint rule," which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987).  The rule makes the plaintiff the master of the claim, and he may pursue his theory of pleading and avoid federal jurisdiction by exclusive reliance on state law. Id.   The Southern District of West Virginia has explained the rule as follows:

> The well-pleaded complaint rule is designed to protect the plaintiff from a defendant reading a cause of action into a complaint where none is stated.  The rule is designed to allow the plaintiff the right to choose the forum for the action.  The Plaintiff may either assert state causes of action only, or he or she may include federal causes of action, thereby leaving the action vulnerable to removal by the defendant.  The well-pleaded complaint rule protects a plaintiff from a defendant who seeks to remove a case where no federal cause of action has been asserted, e.g., where a defendant asserts federal law provides a defense to a plaintiff's well-pled state cause of action.

Id. (emphasis in original). Scott v. S.F. Greiner, 858 F. Supp. 607, 609 (S.D.W.V. 1994).  See also Rice v. Exxon Corp., 631 F. Supp. 1522 at 1524 (S.D.W.V. 1986) (where plaintiff's complaint relied only on West Virginia antitrust law, federal antitrust law is not an essential element; therefore,

2

removal was improper); <u>Spaulding v. Mingo County Board of Education</u>, 897 F. Supp. 284, 288

(S.D.W.V. 1995) (great weight is given to the plaintiff's chosen forum and legitimate doubts as to

the existence of federal jurisdiction must be resolved against removal).  So even when a federal

cause of action is available, the plaintiff may avoid federal subject matter jurisdiction by declining

to invoke a remedy under federal law.

      In the case at bar, the State asserts that CashCall, a non-bank that is unquestionably subject

to West Virginia consumer protection laws, has used an out-of-state bank as a front to circumvent

West Virginia law. This scheme, commonly known as "rent-a-bank" or "rent-a-charter", is discussed

in more detail herein below.  In order to evade the lender licensing and usury laws of West Virginia,

CashCall schemed with the First Bank and Trust of Milbank ("the Bank"), a state-chartered bank in

Milbank, South Dakota.  If the Bank was the lender, the Bank would not have to be licensed by West

Virginia authorities and could "export" whatever interest rates are allowed by its home state under

the doctrine of federal preemption.  <u>See</u> <u>Marquette National Bank of Minneapolis v. First of Omaha</u>

<u>Service Corporation</u>, 439 U.S. 299 (1978).   Since the Bank's home state of South Dakota has no

usury laws, the Bank could lawfully charge interest rates of 99.25% APR (as CashCall charged to

West Virginia consumers) or any interest rate whatsoever without limit.  On the other hand, if

CashCall was the "de facto" lender, as the State asserts in its Complaint. CashCall would be required

to be licensed by West Virginia regulatory authorities and would be subject to West Virginia's usury

laws, which limit interest rates in such loans to 18% APR.

      CashCall's scheme to evade West Virginia law is not novel; it has been attempted and

successfully challenged repeatedly by numerous state attorneys general and financial services

regulators.  In fact, as a result of the collective challenges by state authorities and private plaintiffs,

3

coupled with the concerns by federal agencies that regulate the banks, the rent-a-bank scheme has essentially been eliminated. The scheme's use by CashCall is an anachronism but it, too, is about to end.[1]

In summary, non-bank entities like CashCall have repeatedly sought to evade state usury and lender licensing laws by partnering with national and state-chartered banks to shield themselves from state regulations by asserting preemption rights of the banks. However, the schemes ultimately failed and have been condemned by the federal regulatory agencies because, as the state has alleged in its Complaint, the non-bank entities were the de facto lenders and the banks were essentially lending their charters to the enterprise without any meaningful involvement or oversight. In a nutshell, aside from the fact that the paperwork characterized the loans as being from a bank, the non-bank entities were calling the shots, assumed all or a substantial portion of the economic risk, and the banks had no meaningful involvement at all.

When state regulators sued payday lenders to enforce their lending laws, the non-bank entities removed the cases to federal court. In each case they asserted federal preemption as the basis for removal, as CashCall has done here, even though the banks were not parties to the case. As indicated by the discussion in the next section, the federal courts have almost universally held in these circumstances that the state's claims are not preempted and remanded the case to federal court.

---

[1]The rent-a-bank scheme was once widely employed by payday lenders who sought to make small loans or cash advances that were generally due in two weeks or by the next payday. In order to circumvent state usury laws, the payday lenders (which were not banks) first schemed with national banks, and later with state-chartered banks, to get around state usury laws. Beginning in 2001 and continuing through 2006, first the Office of the Comptroller of the Currency ("OCC") which regulates national banks, and later the Federal Deposit Insurance Corporation ("FDIC"), which regulates state-chartered banks, issued  progressively stronger cautionary guidelines to banks about their relationships with non-banks seeking to avoid state usury laws. By the end of 2006, all national and state banks had terminated their agency relationships with non-bank payday lenders. See generally, Keest & Rennart, The Cost of Credit, § 3.13.3 (3d ed. & Supp. 2008). See also further discussion in Section III D., infra.at 16.

III.   **THE STATE'S CLAIM THAT CASHCALL IS THE "DE FACTO" LENDER DOES NOT PRESENT A FEDERAL QUESTION FOR REMOVAL PURPOSES.**

A.   **Cashcall Has Sought to Evade West Virginia Usury and Consumer Protection Laws by Making Installment Loans over the Internet and by Partnering with State-Chartered Banks.**

Most of the reported cases addressing the rent-a-bank scheme arose when state regulators sued non-bank payday lenders that sought to evade state usury laws by creating agency relationships with national and state-chartered banks. Payday loans are short-term loans or cash advances, typically for a period of 14 days, secured by a post-dated check or by an agreement authorizing debits of amounts owed from the consumer's checking account. In states where payday loans are permitted, they are typically offered at storefront locations; in states like West Virginia that prohibit payday loans, they are offered over the Internet in an effort to evade state regulation.

The payday loan industry has historically sought to evade state usury laws (like the laws of West Virginia) by entering into agency relationships with national and state banks which characterize the banks as the lenders. State regulators have characterized these relationships as "shams".

Payday lending has never been legal in West Virginia, but a company called Valued Services of West Virginia doing business as First American Cash Advance set up an agency relationship with First Community Bank of Milbank, South Dakota, now known as First Bank and Trust of Milbank (yes, the same bank that partnered with CashCall in this case) to evade state usury laws. In February 2006, the FDIC directed the Bank to terminate these activities, and it did so, resulting in the closure of the payday lender's 11 storefront locations in West Virginia by May 2006.

The instant case involving CashCall is another variation of the unsavory scheme that the OCC and FDIC have already condemned. Although CashCall's loans are "installment loans," they

charge interest rates of 99.25% APR, more than five times over West Virginia's interest rate cap for such loans, 18%. Payday lenders typically charge interest rates of 400-800% APR.

The common thread between CashCall and the payday lender cases discussed herein below is that both involve a scheme, or sham, to evade state usury laws by "renting" the preemption privileges of national or state-chartered banks. CashCall also uses the additional artifice of making the loans over the Internet via interactive websites.[2]

**B.    Federal Courts Have Repeatedly Found No Federal Preemption and Granted Remands When State Regulators Challenged Rent-a-Bank Schemes of Payday Lenders.**

On January 14, 2002, the Commissioner of Banks of North Carolina filed suit against Ace Cash Express, Inc. ("ACE"), a non-bank payday lender that had partnered with Goleta National Bank ("Goleta"), in a scheme that North Carolina alleged was intended to circumvent its applicable consumer lending laws. North Carolina did not sue Goleta, but Goleta filed a separate suit against the state of North Carolina in federal court asserting federal preemption and seeking to enjoin the state's investigation of ACE. In its order dismissing Goleta's case, the court in Goleta National Bank v. Lingerfelt, 211 F. Supp. 2d 711 (E.D.N.C. 2002) framed the precise factual issue that CashCall has raised in its notice of removal:

> Although ACE contends that Goleta is the real maker of the loans at issue, the State contends just the opposite; that ACE is using Goleta's name as mere subterfuge as its own unlawful lending practices. Thus, a sharp factual issue is presented as to whether Goleta, the national bank is the real lender at issue. If ACE is the de facto lender, then its payday loans may violate the North Carolina Check Casher Act

---

[2]The Attorney General has successfully enforced West Virginia's consumer protection and usury laws against Internet payday lenders, which has resulted in settlement agreements with approximately 60 companies terminating the making and collection of Internet payday loans in West Virginia. See Press Release of Attorney General issued September 16, 2008, available at www.wvago.gov/press.cfm.

(citation omitted), which prohibits licensed check cashers from
making loans.

Id.

The court in Lingerfelt noted, importantly, that even if Goleta is the true maker of the payday

loans, ACE would still have to comply with the North Carolina Loan Broker Act.  The latter act,

which is very similar to the West Virginia Credit Services Organization Act ("CSO Act"), W. Va.

Code § 46A-6C-1 et seq.,  requires that the loan broker obtain a bond in favor of the State and

provide certain written disclosures to prospective borrowers.   The State has also alleged that

CashCall violated the CSO Act.  See Complaint, fourth cause of action, at 14-16.[3]

The court in Lingerfelt ultimately held that the State's action was not preempted by the

National Bank Act, that Goleta did not have standing, and dismissed the bank's request for

injunction.  In reaching this conclusion, the Court in Lingerfelt noted: "Indeed, a fundamental

assumption of our federal system of government is that state courts are perfectly capable of resolving

cases of federal law, including preemption issues" Id. at 716 (citations omitted).  In summary, the

court in Lingerfelt acknowledged that a state's claims that a non-bank entity is the de facto lender

is a proper inquiry that presents a factual dispute to be resolved by the state trial courts

In another case involving the same bank and payday lender, Goleta sued the Ohio Department

of Commerce in a similar effort to block the State from enforcing its lending laws against ACE,

Goleta National Bank v. O'Donnell, 239 F. Supp. 2d 745 (S.D. Oh. 2002).  Unlike the North

Carolina case, where the State had sued ACE, the Ohio regulator commenced an administrative

_____

[3]In its own words, "CashCall assists them [the banks] in marketing and originating unsecured
installment loans...(emphasis added)...," conduct which falls squarely within the coverage of the CSO Act,
W. Va. Code § 46A-6C-2(a)(2) and (3).  See CashCall's response to the State's subpoena, attached to the
Complaint as Exhibit D at 2.

proceeding to enforce the Ohio Small Loan Act against ACE, which it alleged was circumventing

Ohio's laws by making payday loans through Goleta. In its cease and desist order, Ohio alleged "[i]n

economic reality [ACE] is the lender on the transactions, not [Goleta]." Ohio also alleged that

Goleta sells a 90% participation interest in each loan to ACE and "ACE bears 90% of the risk

associated with each loan, keeps the loan records, receives the loan payments, and is responsible for

expenses related to collection and enforcement of defaulted loans. Id. at 747-748. In this case,

Goleta sued the state of Ohio in federal court and sought to enjoin the state from pursuing its

regulatory action against ACE. The court ultimately found that Goleta lacked standing, that the court

lacked subject matter jurisdiction, and dismissed Goleta's claims. In its detailed analysis, citing

Goleta National Bank v. Lingerfelt with approval, the court noted that the Ohio administrator's case

"is brought only against ACE and is predicated only on state law." The court further held:

> The administrative action against ACE does not implicate the NBA, and Goleta's
> rights under the NBA will not be adjudicated. Defendant [Ohio Administrator]
> merely seeks to determine whether ACE is the true lender on the payday loans. If it
> is, then it is unquestionably subject to the OSLA. However, if Goleta is found to be
> the true lender, then it is undisputed that the Defendant has no authority to regulate
> Goleta's conduct; as a national bank, Goleta is not subject to the OSLA. Defendant
> does not question Goleta's right to make loans to Ohio residents or to charge interest
> rates permitted in the state of California. Goleta's right to use agents to assist in the
> loan-making process and its right to sell a participation interest in the loans may be
> factors that Defendant will consider in determining whether ACE is the true lender.
> However, the rights themselves are not at issue."

Id. at 756-757.

As was the case in Goleta National Bank v. Lingerfelt, the court in this case

acknowledged the right of the state to determine who was the true lender and that

such an inquiry does not present a federal question for removal purposes.

In another case involving ACE, State of Colorado ex rel. Salazar v. Ace Cash Express, Inc., 188 F. Supp 2d 1282 (D.Colo. 2002), the court again sided with the state in its challenge to ACE's rent-a-bank arrangement and similarly found that the state's case was not preempted. In that case, the state of Colorado sued ACE, and did not sue the national bank. ACE, like CashCall in the case at bar, removed the case to federal court on the basis of federal preemption.

In Salazar, ACE sought to assert the preemption of Goleta National Bank which was not a party to the case. In rejecting this argument, the court in Salazar noted that the National Bank Act "regulates national banks and only national banks," and also noted that ACE "attempts to circumvent this result by arguing that it is an agent for loans made by Goleta". Id. at 1284. The court noted that the principle issue raised by the state's remand motion is whether Defendant [ACE] can legitimately assert federal preemption that is available to national banks under the NBA, 12 U.S.C. §§ 21. In remanding the case to state court, the court in Salazar distinguished the case from Marquette, supra, "where the defendant was a subsidiary of a national bank established to administrator its credit card program," and Krispin v. May Department Stores Co., 218 F.3d 919, 922-24 (8th Cir.2000), where the national bank was a wholly-owned subsidiary of the store. Salazar, 188 F. Supp. 2d at 1284-85.

The court in Flowers v. EZPawn Oklahoma, Inc. 307 F. Supp. 2d 1191 (N.D. Ok. 2004) also examined a challenge to a rent-a-bank arrangement in which a non-bank entity removed a case to federal court. In its decision to remand the private class action to state court, the court cited Salazar with approval and noted that the plaintiff's complaint was strictly about a non-bank's violation of state law and alleged no claims against a national bank. Id. at 1194. The court in Flowers noted that federal preemption was raised as a defense to the complaint and explained:

9

> [I]t is now settled law that a case may <u>not</u> be removed to federal court
> on the basis of federal defense, including the defense of preemption,
> even if the defense is anticipated in the plaintiff's complaint, and
> even if both parties concede that the federal defense is the only
> question truly at issue . . . ."

<u>Id.</u> at 1202, <u>citing</u> <u>Franchise Tax Board</u>, 463 U.S. 24 (emphasis in original).  As in the case at bar,

the plaintiffs in <u>Flowers</u> asserted that the non-bank entity was the real lender.  In its decision to

remand the case to state court, the court in <u>Flowers</u> noted that the private plaintiffs have only filed

state action claims against EZPawn and EZ Corp., neither of which is a state-chartered federally

insured (or national) bank.  <u>Id.</u> at 1204-05.  The court acknowledged that although the plaintiffs

alleged that EZPawn was the "real lender" and EZPawn alleged that the bank was the real lender,

the court "must take the plaintiff's allegations as true for purposes of the motion to remand."  <u>Id.</u>,

<u>citing</u> <u>Salazar</u>, 188 F. Supp. 2d 1285.

In an order issued December 22, 2005, the Commissioner of Banks of North Carolina

conducted what is likely the most in-depth analysis ever of a scheme by a non-bank lender to

circumvent a state's usury laws by an agency relationship with an out-of-state bank.  Specifically,

the Commissioner commenced an investigation to determine whether Advance America, Cash

Advance Centers of North Carolina, Inc. ("Advance America"), a payday lender, was improperly

colluding with state-chartered banks to circumvent North Carolina's regulatory scheme by asserting

the bank's right to preemption.  Unlike the present case, where CashCall has refused to produce

documents requested by the Attorney General's subpoena, the Commissioner had the benefit of what

appeared to be complete disclosure of un-redacted documents from Advance America.  The

Commissioner ultimately found that:

> AANC [Advance America] was not the agent in any meaningful
> sense of the Banks with which it entered marketing, processing and
> servicing agreements; rather the banks provided funding for Parent's
> operations in North Carolina through AANC.
>
> * * *
>
> The analysis above makes clear that Parent and AANC [Advance
> America] had a clear and continuing operating control of, and a
> predominant economic interest in, the relationships with each of the
> banks for which AANC [Advance America] was the purported agent,
> and that Parent changed such relationships aggressively, and in the
> case of Republic [a bank] unlawfully, when such change suited the
> purposes of Parent, operating through AANC.

See, In A Matter Before the Commissioner of Banks, Docket No. 05:008:CF, In Re: Advance America, Cash Advance Centers of North Carolina, Inc. at 27 and 28 (Issued December 22, 2005, Joseph A. Smith, Jr., Commissioner of Banks).

Finally, few states have made a greater effort to enforce their lending laws against non-bank entities seeking to evade them through federal preemption than the state of Georgia. Through legislation, Georgia sought to impose its state usury laws on all non-bank entities, such as ACE and the ones discussed in the court cases above, if they retained a "predominant economic interest in the loans." See Ga. Code. Ann. § 16-17-2(b)(4). Georgia enacted this provision to prohibit in-state payday loan stores from circumventing Georgia's usury laws by asserting federal preemption of national and state-chartered banks.

In a series of cases in which both national and state-chartered banks sought to enjoin Georgia regulators from enforcing state usury laws, the state ultimately prevailed and Advance America agreed to end its objectionable partnership with banks. The court in Bankwest, Inc. v. Baker, 411 F.3d 1289 (11th Cir. 2005), provided the most extensive analysis of why states are not preempted from regulating non-bank entities that seek to evade state usury laws through agency

11

agreements with national and state-chartered banks.  Although the decision was ultimately vacated

for mootness,[4] the court in <u>Bankwest</u> concluded that the state of Georgia was not preempted from

enforcing its usury laws against the payday lenders when the payday lenders retain the "predominant

economic interest" in the loan.  <u>Id</u>.  In its analysis, the court explained why it rejected the federal

preemption argument:

> With regard to field preemption, it is clear that the FDIA was not
> intended to "occupy the field" of state bank regulation.  In the case of
> state-chartered banks, the FDIA itself makes it clear that while state
> banks are subject to some federal regulation, the <u>states</u> remain the
> "primary regulatory authority" over state banks participating in the
> FDIC's deposit insurance program (citing 12 U.S.C. §§ 1813(r)).

<u>Id.</u> at 1301-1302 (emphasis in original).

A review of the litigation by state attorneys general and financial services regulators

discussed herein above discloses that the courts have almost universally found that there is no

complete federal preemption and remanded the cases to state court for disposition.  In fact, the main

case that Cashcall cites to support a different outcome is easily distinguishable from the facts of this

case.  The controversy arose in <u>Discover Bank v. Vaden</u>, 489 F. 3d 594 (4th Cir.2007), when

Discover Financial Services ("DFS"), a servicing affiliate of Discover Bank, sued a consumer to

collect a debt allegedly owed to Discover Bank.  The consumer responded by filing several class

action counterclaims against DFS.  Discover Bank then filed suit in federal district court to compel

arbitration of the consumer's counterclaims.

---

[4]The Court of Appeals vacated the decision quoted above at the request of Georgia on the grounds of mootness after all of the banks withdrew from their servicing agreements with the non-bank entities and ceased the objectionable lending activities that Georgia sought to regulate.  See <u>Bankwest, Inc. v. Baker</u>, 446 F.3d 1358 (11th Cir.2006).

In reviewing the corporate structure and the relationship of DFS and Discover Bank, the court noted that DFS was obligated to service certain Discover Bank loan products and to preform all marketing and collection services <u>exclusively</u> for and under instructions from Discover Bank. The agreement between Discover Bank and DFS further provided "DFS will not be responsible for violations of federal or state law, including usury laws..." so long as it acts consistently with directions or supervision received from Discover Bank or its agents." <u>Id.</u> at 602. The court further noted that the servicing agreement provides "that Discover Bank will indemnify DFS for any damages caused by Discover Bank," including any potential judgment from the state court counterclaims against DFS. <u>Id.</u> On these facts, the court in <u>Vaden</u> concluded that Discover Bank is the "real party and interest" with respect to the state court counterclaims. Since Discover Bank is a state-chartered federally insured bank, the court found that the FDIA was implicated by the consumers counterclaims and concluded that there was complete preemption of the usury claims sufficient to provide federal question jurisdiction and to compel arbitration.

While the court in <u>Vaden</u> found Discover Bank to be the real party in interest, it actually followed the principles set forth in the cases cited herein above by the State and acknowledged that the court's conclusion was based upon a factual determination. Importantly, the court in <u>Vaden</u> found:

> In finding Discover Bank to be the real party in interest here, <u>we emphasize the heavily fact-dependent nature of our analysis and its consequent parameters. Clearly, a state-chartered federally insured bank will not always be the real party in interest for purposes of invoking the FDIA</u>. For example, in <u>Golita National Bank v. Lingerfelt</u> (citation omitted), a payday lender had leased an association with the Golita National Bank in order to avoid state usury laws. The <u>Lingerfelt</u> court held that the non-bank payday lender, rather then Goleta National Bank, was the real lender and

13

therefore the complete preemption doctrine did not apply. *Id;* see also Flowers v. EZPawn Okla, Inc., (citation omitted) (finding that EZPawn-not the affiliated bank-was the real lender, and therefore no subject matter jurisdiction existed.) <u>Such cases are distinguishable from the facts here.</u>

Id. at 603, n. 9 (emphasis added). Although the court in <u>Vaden</u> found that Discover Bank was the real party in interest under the circumstances that it examined, it did perform a factual analysis and expressly distinguished its findings from the facts in <u>Goleta National Bank v. Lingerfelt</u> and <u>Flowers v. EZPawn</u> that it cited with approval. Thus, <u>Vaden</u> fully upholds the legal theory as pleaded by the State in its Complaint that the determination of which party is the real lender requires a factual analysis that ordinarily falls within the province of state court.

**C.    The Determination of Whether CashCall is the De Facto Lender Requires Elevation of Substance Over Form.**

In connection with the necessary factual analysis, it is axiomatic that the inquiry must elevate form over substance. In <u>Austin v. Alabama Check Casher's Association</u>, 936 So. 2d 1014 (Ala. 2006), the questions presented concerned whether the Alabama Small Loan Act applied to certain deferred-presentment transactions. In answering the question before it, the court in <u>Austin</u> was required to make a factual determination of the true character of the underlying dealings, and noted importantly:

> The cupidity of lenders and the willingness of borrowers to concede whatever may be demanded and to promise whatever may be exacted in order to obtain temporary relief from financial embarrassment, as would naturally be expected, have resulted in a great variety of devices to evade the usury laws; <u>and to frustrate such evasions, the courts have been compelled to look beyond the form of the transactions to its substance, and they have laid it down as an inflexible rule that the form is immaterial, but that it is the substance which must be considered.</u> No case is to be judged by what the parties appear to be, or represent themselves to be doing, but by the

14

transaction as disclosed by the whole evidence; and, if from that it is in substance receiving or contracting for the receiving of usurious interest for a loan or forbearance of money, the parties are subject to the statutory consequences, no matter what device they have employed to conceal the true character of their dealings.

Id. at 1031-1032, citing Hamilton v. York, 987 F. Supp. 953, 955-56 (E.D.Ky. 1997).

In the case at bar, the State has good reason to believe that CashCall is the de facto lender[5] and has sought to determine the substance of the credit transaction as opposed to the form, which was obviously designed as an artificial device to evade West Virginia's usury laws. Towards this end, the state issued an investigative subpoena to determine the facts, which CashCall has resisted without good cause. The fact that a state-chartered bank could be the real lender does not create a federal question sufficient to confer original jurisdiction to the federal court. Instead, all the cases cited above, including the main case cited by CashCall, support the principle that a factual inquiry must be conducted to determine who is the real lender in circumstances such as those presented by the instance case. Moreover, the cases have made it clear that the factual inquiry must elevate substance over form in making the determination.

## IV.   THE OCC AND THE FDIC HAVE ACTED TO END THE UNSAVORY, UNSAFE AND  UNSOUND PARTNERING OF THE BANKS IT REGULATES WITH THIRD PARTY AGENTS  LIKE CASHCALL THAT SEEK TO EVADE STATE USURY LAWS.

While CashCall has implied in its response to the Attorney General's subpoena that the FDIC approves of and sanctions its business model, that is not the case. In fact, in large part because of

---

[5]Before or shortly after CashCall ceased making loans in West Virginia its web site advised: "CashCall is a finance lending company based in Fountain Valley, California" (emphasis added). It also advised that CashCall "performs marketing services for First Bank of Delaware and First Bank and Trust of Milbank." See www.cashcall.com/FAQ.aspx., March 9, 2007. It is apparent that CashCall only entered agency agreements with banks when necessary to evade usury laws in states like West Virginia. Otherwise, CashCall was, by its own admission, the direct lender.

15

the concerns exposed by state regulatory authorities and private parties in the litigation cited herein above, the main federal agencies that regulate depository institutions, the OCC and the FDIC, have all directed the banks they regulate to terminate these relationships.  As a result of the collective actions of these agencies, the rent-a-bank scheme has been virtually eliminated.  In light of these actions, CashCall's relationship with state-chartered banks is largely an anachronism.  But, as is explained below, a recent action taken by the FDIC against a second bank that CashCall has partnered with is certain to end CashCall's rent-a-bank activities.

During this decade, when we have seen the greatest expansion of the doctrine of exportation of interest rates, no agency has pushed the envelope of federal preemption longer or harder than the OCC.  Nonetheless, even the OCC saw the limits to the doctrine and expressed its grave concerns about the partnering of federal banks with non-bank agents to evade state usury laws.  These concerns were captured in a speech given by Comptroller John D. Hawke, Jr., on February 12, 2002:

> Let me raise one other caution about preemption.  The benefit that national banks enjoy by reason of this important constitutional doctrine cannot be treated as a piece of disposable property that a bank may rent out to a third party that is not a national bank. Preemption is not like excess space in a bank-owned office building. It is an inalienable right of the bank itself.
>
> We have recently seen several instances in which non-bank lenders who would otherwise have been fully subject to various state regulatory laws have sought to rent out the preemption privilege of a national bank to evade such laws.  Indeed, the payday lending industry has expressly promoted such a 'national bank strategy' as a way of evading local laws.  Typically, these arrangements are originated by the payday lender, which attempts to clothe itself with the status of an "agent" of the national bank.  Yet the predominant economic interest in the typical arrangement belongs to the payday lender, not the bank.

> Not only do these arrangements constitute an abuse of the national charter, they are highly conducive to the creation of safety and soundness problems at the bank, which may not have the capacity to manage effectively a multi-state loan origination operation that is in reality the business of the payday lender. As you probably saw, we recently took supervisory action against a small national bank that dramatically demonstrated its inability to manage such a relationship in a safe and sound manner.

(Emphasis added.) The full text of this speech is available at www.occ.treas.gov/ftp/release/2002-10a.doc. It is also significant that the OCC filed an amicus brief in the Salazar case, cited above by the State, in support of Colorado's motion to remand. Therein, the OCC wrote:

> The standard for finding complete preemption is not met in this case. ***. ACE is the only defendant in this action, and ACE is not a national bank. Nor do the Plaintiffs' claims against ACE arise under the National Bank Act or other federal law. Although Defendant apparently attempts to appropriate attributes of the legal status of the national bank for its own operations as a defense to certain Plaintiffs claims, such a hypothetical conflict between federal and state law does not give this court federal question jurisdiction under the doctrine of complete preemption.

State ex rel Salazar v. ACE Cash Express, Clearinghouse No. 53, 556 (D. Colo. Jan. 25, 2002) (emphasis added).

Mirroring the concerns of the OCC, the FDIC continued to express its safety and soundness concerns about the partnering of the banks it regulates with payday lenders in various guidelines that it issued. See Keest & Rennart, The Cost of Credit, § 3.13.3 (3d Ed & Supp. 2008). By late 2005 and early 2006, all but a handful of small South Dakota banks decided to pull out of their bank agency arrangements. Finally, the FDIC sent private letters to the remaining banks urging them to correct deficiencies or terminate the relationships. As a result of these letters, the First Bank of

Delaware, Republic Bank in Kentucky, Bankwest, Inc. of South Dakota, and Community State Bank of South Dakota announced they would cease their payday lending operations in 2006.  By the end of 2006, all other rent-a-bank payday loan operations had ceased due to FDIC intervention.  Id.

It is noteworthy that the bank that CashCall partnered with to evade West Virginia's usury laws, Community State Bank of South Dakota, now known as First Bank and Trust of Milbank, was among the banks who were forced by FDIC intervention to end their rent-a-bank relationships with payday lending operations.  In fact, the Bank had notoriously partnered with Valued Services of West Virginia, d/b/a First American Cash Advance in operating 11 storefront payday locations in West Virginia in defiance of West Virginia's usury laws.  As a result of the FDIC action, the Bank's West Virginia payday loan operations ceased in May 2006.

Although the loans offered by CashCall are installment loans as opposed to payday loans, the business model used by CashCall is essentially the same as the rent-a-bank arrangements that have now been ordered terminated by federal regulatory agencies in that they were designed to enable a non-bank agent to use the federal preemption status of a depository bank to evade a state's usury laws.

A cease and desist order recently issued by the FDIC has likely now terminated CashCall's rent-a-bank operations.  On June 10, 2008, the FDIC issued a sweeping notice of charges for an order to cease and desist against First Bank of Delaware, Wilmington, Delaware, the other bank that CashCall has partnered with, and CompuCredit Corporation, Atlanta, Georgia, (the parent company of Valued Services of West Virginia, the same company that previously owned a rent-a-bank payday lending operation in West Virginia).  The First Bank of Delaware and CompuCredit did not contest the FDIC's action.   Thus, on October 3, 2008, the First Bank of Delaware entered into a

18

comprehensive stipulation and consent to the issuance of a cease and desist order (Consent Agreement) with the FDIC.  In pertinent part, the Consent Agreement at 2 relates that

> "[t]he FDIC has reason to believe that the Respondent (the bank) engaged in unsafe or unsound banking practices and violations of law and/or regulations in connection with the operation and oversight of the Respondent's National Consumer Products Division, including but not limited to, the lending programs offered, marketed, administered, processed, and/or serviced by third parties [including CashCall] pursuant to the agreement set forth in exhibits "A" and "B" attached hereto.  Specifically, the FDIC has reason to believe the Respondent engaged in violations of:  (a) section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), Section 5) [the prohibition against unfair and deceptive acts and practices].

See In the Matter of First Bank of Delaware, Wilmington, Delaware, FDIC-07-256b, FDIC-07-256k, Order to Cease and Desist, Order for Restitution, and Order to Pay (entered Oct. 3, 2008); and Stipulation and Consent to the Issuance of an Order to Cease and Desist, Order for Restitution, and Order to Pay, FDIC-07-256b,  FDIC-07-256k (entered Oct. 9, 2008).  The Exhibit A referenced in the Consent Agreement specifically identified the Consumer Loan Marketing, Origination, And Sale Agreement dated as of January 15, 2007 between CashCall and First Bank of Delaware.  See Consent Agreement, Item 8, at 8.

CashCall has advised the Attorney General that it terminated its lending operations in West Virginia in March 2007.  Upon information and belief, the First Bank and Trust of MIlbank has also terminated its relationship with CashCall nationwide.  Thus, it is apparent that CashCall has ended all of its rent-a-bank relationships with state-chartered banks nationwide.  The only task that remains is to repair the damage and grant such relief as may be warranted to the State and to consumers aggrieved by CashCall's violations of West Virginia consumer protection laws.

## V.     CONCLUSION

For the reasons set forth herein above, the State asks this Court to find that CashCall's

removal was improper and grant the State's motion to remand this civil action to state court.

STATE OF WEST VIRGINIA ex rel.
DARRELL V. McGRAW, JR.,
ATTORNEY GENERAL, Plaintiff

By Counsel

/s/ NORMAN GOOGLE (WV State Bar #1438)
ASSISTANT ATTORNEY GENERAL
Post Office Box 1789
Charleston, West Virginia 25326-1789
Telephone: 304-558-8986
Email: nag@wvago.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**STATE OF WEST VIRGINIA ex rel.**
**DARRELL V. MCGRAW, JR.,**
**ATTORNEY GENERAL,**

        **Plaintiff,**

**v.**                                          **Civil Action No.: 2:08-cv-01292**
                                                      **Judge Joseph R. Goodwin**

**CASHCALL, INC., and**
**J. PAUL REDDAM, in his capacity as**
**President and CEO of CashCall, Inc.,**

        **Defendants.**

## CERTIFICATE OF SERVICE

I, Norman Googel, counsel for Plaintiff, do hereby certify that on December 15, 2008, I electronically filed the foregoing Memorandum of Law in Support of Motion to Remand with the Clerk of the Court using the CM/ECF system, and the following counsel has been served accordingly:

Bruce M. Jacobs, Esquire
Charles L. Woody, Esquire
Alexander Macia, Esquire
Spilman Thomas & Battle, PLLC
PO Box 273
Charleston, West Virginia  25321
*Via ECF System*

Eric N. Whitney, Esquire
J. Scott Sheehan, Esquire
Leah Edmunds, Esquire
Greenberg Taurig, LLP
MetLife Building
200 Park Avenue
New York, NY  10166
*Via United States Mail*

/s/ NORMAN GOOGEL #1438
Consumer Protection/Antitrust Division
812 Quarrier Street, 1st Floor
Charleston, West Virginia 25301
(304) 558-8986