IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

STATE OF WEST VIRGINIA ex rel.
DARRELL V. McGRAW, JR.,
ATTORNEY GENERAL,

       Plaintiff,

v.                           Civil Action No. 2:08-cv-01292
                              Judge Joseph R. Goodwin

CASHCALL, INC., and
J. PAUL REDDAM, in his capacity as
President and CEO of CashCall, Inc.,

       Defendants.

REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT CASHCALL'S MOTION TO DISMISS

INTRODUCTION

      Defendant CashCall, Inc. ("CashCall") established in its Motion to Dismiss that state-chartered, FDIC-insured banks are subject to federal regulations that preempt conflicting state lending laws, including the registration requirements and interest rate limitations of the West Virginia Consumer Credit and Protection Act ("WVCCPA") sought to be enforced by the Attorney General against CashCall in this case.  The loans at issue in this case were made by the First Bank and Trust of Milbank ("the Bank"), a federally-regulated bank.  CashCall acted as the Bank's agent in marketing and originating the loans at issue, subjecting CashCall to the same federal regulations.  As such, CashCall submits that the Attorney General's claims against CashCall are pre-empted by federal law to the same extent as if they were brought directly against the Bank.  Therefore, the Attorney General's second through fourth causes of action,

seeking to enforce the state's lender registration and usury laws, which expressly exclude from their coverage federally regulated banks (as they must), are preempted by federal law and should be dismissed.

The Attorney General asserts a flawed legal analysis to suggest that CashCall rather than the Bank was the true lender in these transactions and, therefore, federal preemption should not apply. The Attorney General relies upon several cases involving FDIC-disfavored payday loans in which it was alleged that federal preemption was not available because the payday lender had the primary economic interest in its relationship with a federally-regulated bank with which it was originating loans. The Attorney General's argument is flawed for several reasons. First, the United States Court of Appeals for the Fourth Circuit has not adopted the predominate interest analysis -- relied upon by the Attorney General -- which has been criticized as an attempt to supersede legislative intent. Instead, the correct federal-law standard for whether the Bank is the true lender is whether the Bank underwrites the loans, approves loan applications and provides funds for the loans. The preemption analysis that the Fourth Circuit has adopted supports CashCall's contention that as a matter of law, the Bank is the real lender and CashCall, as an agent of the Bank, is exempt from these state lending laws. Second, neither the Bank nor CashCall is a payday lender[1]; indeed, the FDIC has expressly distinguished these long-term installment loan products from short-term payday loans, and recommended them as alternative longer-term credit products.

CashCall also established in its Motion to Dismiss that the Attorney General's authority to issue and seek enforcement of subpoenas under the WVCCPA is limited to pre-litigation

---

[1] The Bank's loans in this case are unsecured installment loans with typical maturities of 42 months. There is no dispute that any of these loans are two-week pay-day loans, or anything similar, or that the loans have other characteristics of pay-day loans, e.g., consumer checks that are held for deferred presentment.

investigations.[2]  Any enforcement of a subpoena after the commencement of a civil action is specifically barred by the statutory language of WVCCPA.  The federal cases cited by the Attorney General involve different statutes and regulatory bodies.  As such, they are irrelevant to the proper application of the WVCCPA.

Lastly, CashCall demonstrated that neither of the two sections of the WVCCPA cited in the sixth cause of action bar CashCall from threatening to commence arbitration, as expressly provided by the applicable loan documents, in connection with its efforts to collect debts from borrowers.  Again, the Attorney General responded by referencing federal statutes and case law that are inapposite to the specific language in the WVCCPA upon which the Attorney General purportedly relies.  Therefore, the sixth cause of action should also be dismissed.

## ARGUMENT

**I.      CASHCALL'S MOTION TO DISMISS SHOULD BE EVALUATED UNDER FEDERAL LAW**

The Attorney General contends that the Court should apply state law in determining whether to grant CashCall's motion to dismiss because the Complaint was filed in state court and purports to assert only state law claims.  Tellingly, however, the Attorney General provides no legal authority to support this argument.  CashCall removed the case to federal court based on the presence of a federal question, namely, the pre-emptive effect of federal banking law on certain of the state law claims asserted by the Attorney General; and this federal pre-emption question forms the basis of CashCall's motion to dismiss.   Federal courts apply federal law when evaluating motions to dismiss raising a federal question.  *See Stewart v. West Virginia*

---

[2]  CashCall does not concede that the Attorney General's investigative power under the WVCCPA permits it to examine the Bank's federally-regulated loans owned by CashCall; however, in response to the original subpoena, CashCall voluntarily produced documents reflecting its relationship with the Bank and contends that any further investigation, if permitted at all, must proceed through civil discovery in this action.

3

*Employers' Mutual Ins. Co.*, 2007 WL 4300595 (S.D.W. Va. 2007) (applying the Supreme Court's analysis in *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955 (2007), to motion to dismiss claims brought before the court based on federal question jurisdiction and supplemental jurisdiction); *Ford v. Musashi SC, Inc*., 2008 WL 4414497 (D.S.C. 2008) (same).

## II.    THE SECOND THROUGH FOURTH CAUSES OF ACTION ARE FEDERALLY PREEMPTED

### A.    CashCall Clearly Established that the Bank is the True Lender Under the Marketing Agreement

In its Motion to Dismiss, CashCall showed that it was acting as the marketing agent for the Bank, which is the true lender under federal law.  *See* Memorandum of Law In Support of Defendant CashCall's Motion to Dismiss ("Def. Br.") at 8-9.  According to the terms of the Marketing Agreement, the Bank underwrites the loans, approves loan applications and provides funds for the loans.  (Def. Br. at 4).  CashCall serves as the Bank's marketing agent, bringing customers to the Bank.  *Id*. at 5.  CashCall's activities are constantly monitored by the Bank through full-time bank employees located at CashCall's facilities, as well as direct compliance audits.  *Id*.  As delineated below, federal law explicitly authorizes such a relationship and establishes that the issuing bank is the true lender even when the bank exercises its federal lending powers with the assistance of a marketing agent such as CashCall.

The Attorney General does not seriously challenge the validity or propriety of this relationship, other than pejoratively calling it as a "rent-a-bank scheme."  Reading beyond the Attorney General's invective, however, the Attorney General explicitly concedes that "[i]f the Bank was the lender, the Bank would not have to be licensed by West Virginia authorities and could 'export' whatever interest rates are allowed by its home state under the doctrine of federal

preemption." (Remand Br. at 3).[3]  Where CashCall and the Attorney General disagree, and what CashCall contends is correct legal analysis, is that CashCall, as the Bank's agent, is itself subject to FDIC jurisdiction and supervision and included within the pre-emptive effect of the federal banking laws.

> **B.      The Bank, as the True Lender, is Subject to Federal Regulations that Preempt State Laws as Applied to CashCall**

CashCall demonstrated in the Motion to Dismiss that the Bank Services Company Act ("BSC Act") applies to CashCall as a marketing agent for the Bank, and the Act preempts state usury laws.  The Attorney General concedes that the BSC Act authorizes banks to "enter into agency agreements with third parties to assist in the performance of banking duties."  (Opp'n Br. at 17.)  And the Attorney General does not dispute that such third parties "shall be subject to regulation and examination… to the same extent as if such services were being performed by the depository institution on its own premises."  *Id*.  Rather, the Attorney General argues that regulation by the FDIC of CashCall's business as an <u>agent</u> of the Bank does not preempt regulation by state entities because there is nothing in the BSC Act expressly preempting such state regulation.  *Id.*  But the Attorney General offers no legal authority to support this contention, and case law cited in the Motion to Dismiss demonstrates that national banks, and state-chartered, FDIC-insured banks by extension, can engage in lending activities through agents without state law restrictions on the banks or their agents.  (Def. Br. at 11, *citing Easton v. Iowa*,

---

[3] In the State's Memorandum of Law in Opposition to CashCall's Motion to Dismiss ("Opp'n Br."), the plaintiff claims that "[t]he State has already briefed the preemption issue exhaustively in its Remand Memorandum; thus, there is not need to repeat the argument here."  (Opp'n Br. at 16.)  Therefore, in order to refute the plaintiff's arguments in the Opposition Brief, CashCall must periodically refer to portions of the State's Memorandum of Law in Support of Motion to Remand ("Remand Br.").

188 U.S. 220 (1903); *SPGGC v. Ayotte*, 488 F.3d 525 (1st Cir. 2007); *State Farm Bank, F.S.B. v. Burke*, 445 F. Supp. 2d 207 (D. Conn. 2006).)

Of the conclusive federal cases cited in the Motion to Dismiss, the Attorney General takes issue with only one, *Discover Bank v. Vaden*, 489 F.3d 594 (4th Cir. 2007).  In *Vaden*, the Fourth Circuit, analyzing claims against a credit card marketer and servicer, held that the bank that issued the cards was the "real" party in interest and therefore, the Federal Deposit Insurance Act ("FDIA") applied.  *Id.*  The Attorney General asserts that *Vaden* supports the legal theory pleaded in the complaint "that the determination of which party is the real lender requires a factual analysis that ordinarily falls within the province of state court."  (Remand Br. at 14.)  But the *Vaden* court's observation that "[t]he identity of the 'real' party may not always be apparent from the face of pleadings; it may be necessary to look beyond the pleadings to the facts of the dispute" is limited.  489 F.3d at 601.  In the instant case, no deeper analysis is necessary because the "real" party is apparent from the pleadings themselves, which include the applicable agreements.  As set forth above, the Parties do not appear to dispute the facts of CashCall's relationship with the Bank; rather, they primarily dispute its legal effect.

The Attorney General simply disregards the other cases cited in the Motion to Dismiss that show, like *Vaden*, that the Attorney General's claims are federal preempted.[4]  Nor does the Attorney General dispute that the West Virginia statutes themselves exempt from their purview federally-regulated banks and loans.  (Def. Br. 16-17.)

---

[4] *See Republic Bank & Trust Co. v. Kucan,* 245 Fed.Appx. 308, 313 (4th Cir. 2007), *Pacific Capital Bank, N.A. v. Milgram,* 2008 WL 700180 (D.N.J. 2008); *Watters v. Wachovia Bank, N.A.*, 127 S. Ct. 1559, 1564 (2007); *H & R Block Eastern Ent. Inc. v. Turnbaugh*, No. MJG-07-1822 (D. Md. July 29, 2008); *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1037 (9th Cir. 2008).

6

### C.   The Attorney General Mischaracterizes CashCall's Relationship With the Bank as a "Rent-A-Bank" Scheme Similar to the Kind Engaged in by Payday Lenders

Instead of addressing CashCall's specific business relationship with the Bank, the Attorney General resorts to unfounded accusations that CashCall is the de facto lender and has associated with the Bank in an attempt to "rent a bank" and avoid West Virginia usury laws.  In support of these claims, the Attorney General cites several cases involving payday lenders, without explaining how CashCall's relationship with the Bank is even remotely similar to the payday lending model.  The Attorney General also ignores important differences between the short-term, check-secured, "payday" loans and the long-term, unsecured, installment loans marketed by CashCall for the Bank, as well as the fact that the FDIC has expressly approved of the latter.

Furthermore, in lumping CashCall in with payday lenders involved in so-called "rent-a-bank" schemes, the Attorney General ignores the legitimate reasons for the relationship between CashCall and the Bank described in the motion to dismiss.  By using CashCall as an agent, the Bank is able to compete with larger, national banks.  (Def. Br. at 5.)  Indeed, one of the purposes behind enacting the FDIA was to "provide [ ] parity, or competitive equality, between national banks and State chartered depository institutions…"  126 CONG. REC. 6,900 (1980).

### D.   Payday Lending Cases do not Bar Federal Preemption of State Regulations

The cases involving cited by the Attorney General in the Motion to Remand are easily distinguishable from the instant case and do not bar federal preemption under CashCall's business arrangement with the Bank.  In *Goleta National Bank v. Lingerfelt*, Goleta (a bank) and Ace (a payday lender) filed a federal lawsuit requesting that the federal court determine several issues pertinent to a separate state court action brought by the state against Ace, including the

issues of preemption, constitutional rights, and injunctive relief.  211 F. Supp. 2d 711, 713 (E.D.N.C. 2002).  The State of North Carolina moved to dismiss the federal action in part under the doctrine of *Younger* abstention, which holds that a federal courts should not interfere with state actions in the manner requested.  *Id.* at 714.  The plaintiffs argued that the court should intervene because "extraordinary circumstances justify circumvention of the *Younger* doctrine." *Id.* at 717.  Specifically, the plaintiffs argued that federal law preempted the state action.  *Id*.  The court held as an initial matter "that even a substantial claim of federal preemption does not preclude *Younger* abstention."  *Id*.  Therefore, the subsequent preemption analysis quoted by the Attorney General in the Motion for Remand was mere dicta.

In *Goleta National Bank v. O'Donnell*, Goleta again brought suit, this time against the Ohio Department of Commerce, and sought an injunction preventing the Department of Commerce from regulating Ace.  239 F. Supp. 2d 745, 748 (S.D. Ohio 2002).  The Ohio Department of Commerce made a motion to dismiss based in part on Goleta's lack of standing. The court specifically held that "[b]ecause the Court concludes that Goleta lacks standing… [t]he Court need not address the remaining arguments raised by the defendant and does not reach Plaintiff's preemption argument raised in its motion for preliminary injunction."  *Id*. at 750. Therefore, the court in *O'Donnell* made no ruling on the issue of preemption and the case is completely inapplicable to the motion to dismiss.

In *State of Colorado et rel. Salazar v. Ace Cash Express, Inc.*, the State of Colorado brought an action against Ace.  188 F. Supp. 2d 1282 (D. Colo. 2002).  From a procedural standpoint, the court in *Salazar* considered a motion to remand and not a motion to dismiss. More importantly, to the extent that the Court's analysis relied upon its conclusion that the

National Bank Act "regulates national banks and only national banks," CashCall submits that this Colorado Court got it wrong. That holding is directly contradicted by multiple Fourth Circuit opinions as well as the Supreme Court's recent decision in *Watters v. Wachovia Bank*, discussed below. 550 U.S. 1, 127 S. Ct. 1559 (2007).

The decision in *Bankwest, Inc. v. Baker*, 411 F.3d 1289 (11th Cir. 2005), is also inapposite to the case at hand, and it is important to note that Bankwest only dealt with "in-state" agents under a specific Georgia statute, that the case was not concluded on the merits and was scheduled to be reheard *en banc* before it was determined to be moot, and that there is a correctly reasoned dissenting opinion that states that the plain language of the federal statute (Section 27(a), Federal Deposit Insurance Act) provides state banks the federal power to export "any" loan. *Bankwest, Inc. v. Baker*, 411 F.3d 1289, 1315, 16 (11th Cir. 2005) (Carnes, J., dissenting), *vacated for rehearing en banc* 433 F.3d 1344 (11th Cir. 2005), *grant of rehearing vacated*, 2006 U.S. App. LEXIS 10461 (11th Cir. 2006), *appeal dismissed* 446 F.3d 1358 (11th Cir. 2006).

In *Bankwest*, Georgia passed a law that purports to preclude certain types of agency agreements between *in-state* payday stores and out-of-state banks.[5] A number of banks and

---

[5] Even putting aside other reasons why the legal model being utilized by the Bank and CashCall is permitted, it important to note that the distinction between "in-state" agents and "out-of-state agents" appears to be a dividing line under the Georgia statute considered in *Bankwest*. Not only does *Bankwest* consider that distinction, the Georgia statutes appears solely to address "in-state" agents. In this regard, the Georgia statute states:

> The General Assembly declares that the use of agency or partnership agreements between *in-state entities* and out-of-state banks, whereby the *in-state agent* holds a predominant economic interest in the revenues generated by payday loans made to Georgia residents, is a scheme or contrivance by which the agent seeks to circumvent Chapter 3 of Title 7, the "Georgia Industrial Loan Act," and the usury statutes of this state.

GA. STAT. §16-17-1(c) (emphasis added). From this plain language, it seems reasonable to conclude that the Georgia statute itself would not apply to out-of-state agents and would not purport to consider use of out-of-state agents to be a "contrivance" to avoid Georgia law.

payday lenders sued Georgia state officials, seeking a declaratory judgment that the Georgia statutes were unconstitutional and an injunction preventing enforcement of the statutes. A panel of the the Eleventh Circuit held that the Georgia statutes were not preempted by federal laws because the Georgia statute did not apply to any loan made by an out-of-state bank through an in-state payday agent unless the payday store retained "the predominate economic interest" in the loan. The West Virginia statutes at issue in the present case do not include any similar qualifications. As such, they run headlong into federal law when the Attorney General attempts to enforce them against CashCall.

Indeed, Circuit Judge Carnes' dissent in *Bankwest* provides the correct federal-law standard and gave a particularly scathing critique of the majority's reasoning in allowing even limited state regulation of bank agents. According to Circuit Judge Carnes, Congress "probably thought that using broad language to create the federal right and inserting a clear and unequivocal preemption clause to protect that right from state interference would be enough. If so, it underestimated the State of Georgia's determination to evade federal law and the willingness of this Court to permit states to do so." 411 F.3d at 1315. In analyzing the statute, Circuit Judge Carnes utilized a plain-language standard by looking at "the relevant portion of FDIA § 27(a) [which] plainly says that 'State-chartered insured depository institutions... may, *notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section*,... charge on *any loan*... interest... at the rate allowed by the laws of the State... where the bank is located.'" *Id*. The key term in interpreting the scope of the federal right as defined under section 27(a) is "any" from the phrase "on any loan." *Id*. The dissent, in analyzing decisions of the Supreme Court and the Eleventh Circuit, found that they "emphasize

10

and re-emphasize that 'any' does not mean some, or most; it means all." *Id.*  Therefore, "[b]ecause loans that out-of-state banks make through in-state agents are within the broad scope of the term 'any loan,' § 27(a) preempts state laws that attempt to regulate or restrict the interest rates that may be charged on those loans.  In other words, § 27(a) preempts what the State of Georgia has done." *Id*. at 1316.

Using particularly colorful language, Circuit Judge Carnes' correctly reasoned dissent compared the exception permitted by the Eleventh Circuit "[w]ith mimicry that would make a mockingbird blush," pointing out the absurdity of upholding Georgia's usury laws because "Congress did not say out-of-state banks could use in-state agents under the specific contractual terms that BankWest uses Advance America.  Of course it didn't." *Id*.  Furthermore, in arguing against the majority position that the Georgia law only limits one aspect of the agency relationship between banks and agents, the dissent finds that "[t]he reality is that Georgia has acted to strip from out-of-state banks the right that § 27(a) gives them, if those banks structure their business in the way that they think best in light of business considerations and market forces." *Id*. at 1318.  And based on the majority's opinion, the state of Georgia need not stop at barring relationships between out-of-state banks and in-state agents when the in-state agent "has the predominant economic interest."  *Id*.  Rather, under the majority opinion, "Georgia could simply declare that, under its own definition of the federal statutory terms, any in-state agent of an out-of-state bank is the de facto lender, not the bank." *Id*.  at 1318.

Finally, Circuit Judge Carnes' dissent recognized "the serious policy concerns that motivated the Georgia General Assembly to enact [the] legislation." *Id*. at 1319.  However, the dissent also recognizes that the duty of the court "is to interpret the laws that Congress has

enacted, not to shape them to our policy views…" *Id*.  "Any complaints about the policy effects of § 27(a) are, to borrow a phrase from the Supreme Court in another banking case, best addressed to the wisdom of Congress than to the judgment of this Court.'" *Id*. (citation omitted).

Such is the danger of the Attorney General's argument in the instant case.  By making the unfounded assertion that CashCall is the de facto lender and thus subject to West Virginia usury laws, the Attorney General opens the door to regulate any in-state agent or out-of-state agent of an out-of-state bank with the effect being to prevent or interfere with "the banks [from] exercis[ing] their federal statutory right to charge § 27(a) interest rates." *Id*. at 1317.  Moreover, the Attorney General asks this Court to engage in policy-making by making an end-run around established federal law by engrafting provisos and qualifiers to the plain-language "any" that is used in the federal statute.

The remaining cases cited by the Attorney General are similarly inapplicable.  In *Flowers v. EZPawn Oklahoma, Inc.*, the federal court in Oklahoma considered a motion to remand brought by class members in a class action suit against a pawn shop.  307 F. Supp. 2d 1191, 1196 (N.D. Okla. 2004).  In *Flowers*, the court declined to rule on the issue of preemption.  *Id*. at 1206.  Therefore, *Flowers* has no bearing on the motion to dismiss.  Similarly, the December 22, 2005, order from Commissioner of Banks of North Carolina, quoted in the Motion to Remand, determining that a payday leading company maintained a predominant economic interest in its relationship with banks has no barring on whether CashCall was the de facto lender in the instant case.  Nor does the order address the issue of preemption.  In *Austin v. Alabama Check Casher's Association*, a consumer group sought judgment declaring that check casher stores, without any involvement with state-chartered banks, had made loans subjecting them to the Alabama Small

12

Loan Act.  936 So. 2d 1012, 1025 (Ala. 2006).  The case did not concern federal preemption.  *Id*. Furthermore, *Hamilton v. York* concerned a cash checking store that tried to hide the fact that it was making loans to customers.  *Id*. at 1031 (*citing* 987 F. Supp. 953, 955-56 (E.D. Ky. 1997)).

> **E.   The Fourth Cause of Action, Violation of West Virginia Credit Services Organization Act,  is Also Preempted**

Relying on *Goleta National Bank v. Lingerfelt*, the Attorney General erroneously contends that CashCall must comply with the West Virginia Credit Services Organization Act ("CSO Act") because the Act does not infringe upon the National Bank Act ("NBA") and therefore, is not subject to federal preemption.   As stated above, *Lingerfelt* is easily distinguishable from the instant case and its observations on federal preemption are pure dicta. More importantly, that court's statements to the effect that even if the bank were the true lender, the North Carolina Loan Broker Act ("LBA") would still apply to the payday lender because the NBA's "sole province [is] to regulate the interest collected by national banks" is completely nullified by the Supreme Court's recent ruling in *Watters*.  550 U.S. 1, 127 S. Ct. 1559.  A focus on interest-rates alone is myopic.  Federal banking law also establishes a bank's prerogative to utilize agents in exercising a bank's federal powers.  The correct legal analysis under the BSC Act and the FDIA is to focus upon the Bank's powers, not who assists the Bank in exercising those powers, to recognize a small Bank's prerogative to utilize agents in order to more effectively compete with larger banks, and with CashCall as the Bank's agent being subject to FDIC jurisdiction and supervision and treated as if it the bank itself acting on its premises.

In *Watters*, a federally chartered bank and its mortgage lending subsidiary brought suit against the Commissioner of the Michigan Office of Insurance and Financial Services seeking declaratory and injunctive relief from state registration and inspection requirements based on

preemption by the NBA.  *Id*.  The Supreme Court, in analyzing the preemption claims, found that "[b]usiness activities of national banks are controlled by the National Bank Act (NBA or Act), 12 U.S.C. § 1 et seq., and regulations promulgated thereunder by the Officer of the Comptroller of the Currency (OCC).  As the agency charged by Congress with supervision of the NBA, OCC oversees the operations of national banks and their interactions with customers." *Id*. at 1564 (citations omitted).  Therefore, under the NBA, the normal business operations of a national bank "are subject to OCC's superintendence, to the exclusion of state registration requirements and visitorial authority." *Id*.  Hence the NBA <u>would</u> preclude registration and other requirements under the LBA as applied to a national bank and *Lingerfelt*'s assertion that "the LBA's requirements do not, in any way, touch upon the NBA's sole province to regulate the interest collected by national banks" is superseded.  *Lingerfelt,* 211 F. Supp. 2d at 718.

The Court also held that just as the NBA precluded state examination, supervision and regulation of national banks, so too did it preclude regulations directed at the operating subsidiaries of national banks.  *Id*. at 1562.  In reaching this conclusion, the Court first noted that the "OCC has authority to supervise and regulate operating subsidiaries in the same manner as national banks." *Id*. at 1570.  The Court then stated:  "We have never held that the preemptive reach of the NBA extends only to a national bank itself.  Rather, in analyzing whether state law hampers the federally permitted activities of a national bank, we have focused on the exercise of a national bank's powers, not on its corporate structure. *Id*. at 1570.  CashCall has already demonstrated that Bank Service Company Act, 12 U.S.C.A. § 1861-67, authorize banks to use agents and these agents are subject to the same federal-law jurisdiction and supervision as

national and state-chartered banks.  (Def. Br. at 10.)  Therefore, as in *Watters*, federal banking

law preempts West Virginia regulation of CashCall under the CSO Act.[6]

    **F.**    **The Attorney General's Assertion that the FDIC and OCC Have Somehow Restricted or Terminated CashCall's Business Is Inaccurate**

    The Attorney General, in a last-ditch effort to thwart federal preemption, mistakenly

asserts that the OCC and FDIC's restrictive policies toward payday lenders somehow impacts the

Bank's installment loan program with CashCall.  (Remand Br. 14-19.)

    OCC Comptroller John D. Hawke, Jr. specifically referenced payday lenders in his

February 12, 2002, speech regarding the rental of preemption by third parties.  While

Comptroller Hawke expressed caution about risks associated with banks "which may not have

the capacity to manage effectively a multistate loan origination operation that is in reality the

business of the payday lender," he did not suggest that the states have a right to regulate these

organizations as a result of risks involved.  John D. Hawke, Jr., Comptroller of Currency,

Address before the Women in Housing and Finance (Feb. 12, 2002).  To the contrary, the

sentences following the quote cited made it clear the federal government's view that agents of

---

[6] Besides the preempted West Virginia lender statutes, the Attorney General cites the West Virginia Credit Services Organizations Act (the "CSOA"), §46A-6C-1 *et seq.*, to suggest that CashCall, notwithstanding its federally-supervised role as the Bank's agent, must comply with the extensive requirements for credit service organizations (e.g., registration, bonding, disclosure statements, contract requirements, and 3-day right to cancel).  Credit services organizations are a variety of independent loan broker who for compensation from the consumer separately contracts with the consumer to arrange a loan with a third-party lender.  CashCall, as the disclosed agent for the Bank, however, would not be engaged in an independent activity of contracting with consumers to arrange a loan for the consumer, nor does CashCall obtain any compensation from the consumer. *See, e.g.*, §46A-6C-2(a)("payment of money or other valuable consideration"); and §46A-6C-3(1)(prohibition against a credit service organization "[charging] a buyer or [receiving] *from a buyer* money or other valuable consideration before completing performance of all the credit services the organization has agreed to perform *for the buyer*")(emphasis added). Instead, under the BSC Act and the FDIA, CashCall's activities for the Bank are tantamount to the Bank acting itself on its own premises. Moreover, even if the CSOA were otherwise applicable, the CSOA is preempted by the federal banking law; and the CSOA would also exempt CashCall as the Bank's agent under the  CSOA's exemption for insured banks (§46A-6C-2(a)(2)) or its exemption for federally regulated and supervised persons (§46A-6C-2(a)(1)). Whether the CSOA is simply inapplicable by its own terms, CSOA exemption, or federal preemption, the CSOA provides no basis for a claim against the Bank or CashCall as the Bank's agent

15

federally-regulated lenders would be subject to federal authority.  *Id*.  Comptroller Hawke also described the "value-blind" nature of preemption:

> It's important to note that, for better or worse, the preemption doctrine is value-blind and agnostic with respect to the desirability of the state law involved.  In preemption situations, the only relevant issue is whether the state law would impair or significantly interfere with a national bank's exercise of powers granted to it under federal law. If such an impact is found to exist, federal law must prevail.  Any opinions we might have about the desirability or merit of the laws in question are not relevant.

*Id.*  Such is precisely the case here.

Finally, the Attorney General interjects two points to try to obfuscate the issues.  The Attorney first notes that CashCall previously advised it that it ceased marketing new loans in West Virginia in March 2007.  That is true but irrelevant.  The Bank and CashCall chose to stop making new loans, but not for any reasons concerning the legality of the loans.  The Attorney General next notes a recent Consent Agreement between the FDIC and First Bank of Delaware pursuant to which, *inter alia*, the First Bank of Delaware terminated its third party marketed lending programs, including but not limited to a program marketed by CashCall.

The CompuCredit case provides no support to the Attorney General unfounded assaults on scope and validity of federal banking law preemption of state law.  Instead, if relevant at all, the CompuCredit case demonstrates that bank agents are subject to FDIC jurisdiction and supervision and that the FDIC is able and willing to take regulatory action when the FDIC considers it necessary or advisable.

The CompuCredit case involved certain federal-law safety and soundness concerns that the FDIC had with the First Bank of Delaware and CompuCredit, which is a consumer finance credit card company located in Atlanta, Georgia.  The case has nothing to do with the scope and

16

validity of federal banking law preemption of state law.  The FDIC complaint and the resulting

Consent Agreement are completely unrelated to CashCall's specific agreement with First Bank

of Delaware.  CashCall was not part of the FDIC's complaint against First Bank of Delaware nor

was CashCall in anyway directly involved in the dispute.  And while First Bank of Delaware's

decision to suspend all third party marketed lending programs could have some bearing on

alleged ongoing or future conduct by CashCall, they are wholly irrelevant to the Attorney

General's claims that relate exclusively to periods when that agreement was in place.  Hence, the

Attorney General's speculations are irrelevant.

## III.   THE FIRST CAUSE OF ACTION, FAILURE TO COMPLY WITH SUBPOENA, SHOULD BE DISMISSED

### A.   The Attorney General's Subpoena Power is Limited

Despite the Attorney General's lengthy explanation of the Attorney General's authority

in general to issue investigative subpoenas, CashCall has never disputed this authority.  Nor does

CashCall dispute that West Virginia law authorizes the Attorney General to pursue investigations

for the enforcement of consumer protection provisions under the WVCCPA. Rather, CashCall

contends that the Attorney General is only authorized to issue subpoenas while conducting such

investigations.  (Def. Br. at 18.)  The statute specifically states that the Attorney General may

"make an investigation to determine if the act has been committed and, *to the extent necessary

for this purpose*, may administer oaths or affirmations, and, upon his own motion or upon request

of any party, may subpoena witnesses, compel their attendance, adduce evidence…"   W. VA.

CODE § 46A-7-104(1) (West 2008) (emphasis added).  Here, the Attorney General has conducted

an investigation and concluded that an act has been committed by CashCall.  (Def. Br. at 7.)

Since the investigation of CashCall culminated in the claims presented in the Complaint, the

Attorney General is no longer pursuing an ongoing investigation and therefore, its ability to enforce a subpoena against CashCall has ceased.

The cases cited by the Attorney General in support of its contention that "administrative agency subpoenas must be enforced almost without restriction," in reality offer clearly defined restrictions on the ability of the Attorney General to enforce subpoenas.  (Opp'n Br. 4).  In *State ex rel. Palumbo v. Graley's Body Shop*, the Court commented that "the investigatory power of the Attorney General… is best compared to the authority of an administrative agency to investigate <u>prior</u> to making any charges of a violation of the law."  425 S.E.2d 177, 182 n.2 (W. Va. 1992).  (emphasis added).  Hence the court in *Graley* emphasized the power of the Attorney General to issue a subpoena only prior to making charges as a result of an investigation.  And in both *West Virginia Human Rights Commission v. Moore,* 411 S.E.2d 707, 707 (W. Va. 1991) and *State ex rel. Hoover v. Berger*, 483 S.E.2d 12, 18 (W. Va. 1996), the courts premised the enforceability of a subpoena on legislative authority to issue the subpoena.  The Attorney General argues that "[t]here is no question that the investigative subpoena issued by the Attorney General to CashCall meets the federal standards…" described in *Moore* and *Berger*.  (Opp'n Br. 7.)  However, as described above, the authorizing WVCCPA statute limits the authority of the Attorney General to issue subpoenas to those necessary to "determine if the act has been committed…" W. VA. CODE § 46A-7-104(1) (West 2008).

B.   **The Cases Cited to Refute CashCall's Argument that the Commencement of Civil Proceedings Terminate the Subpoena Power of the Attorney General are Inapposite**

The Attorney General contends that the commencement of a civil proceeding against CashCall has no bearing on the authority of the Attorney General to continue to pursue

compliance with a subpoena related to the same matter.  In support of his argument, the Attorney

General first cites to *Sutros Bros. & Co. v. S.E.C.*, where the court held that Section 21(a) of the

Securities Exchange Act of 1934 authorizes the SEC to continue to investigate a broker after the

SEC commenced an action against the broker.  199 F.Supp. 438 (S.D.N.Y. 1961).  Similarly, in

*Linde Thomson Langworthy Kohn & Vandyke, P.C. v. Resolution Trust Corp.*, the court held that

the Resolution Trust Corporation could continue to pursue a subpoena because "the clear

language of the order of investigation leaves no room for the conclusion that this administrative

subpoena serves no other purpose."  5 F.3d 1508, 1518 (D.C. Cir. 1993).  These cases are based

on federal statutes that have no bearing on the instant matter.  Furthermore, in *Resolution Trust

Corp. v. Thornton*, the D.C. Court of Appeals clarified its position in *Linde Thomson*, holding

that it only allowed the RTC to continue to pursue the subpoena "after finding that two of the

subpoena's purposes, both related to uncovering further wrongdoing by the subpoena recipient,

remained viable after suit was filed."  41 F.3d 1539, 1545-46 (D.C. Cir. 1994).  Therefore, the

first cause of action should be dismissed as a matter of law for failing to state a claim.

## IV.   THE SIXTH CAUSE OF ACTION, ALLEGING THAT CASHCALL THREATENED TO TAKE ACTION PROHIBITED BY THE WVCCPA, SHOULD BE DISMISSED

The Attorney General claims that CashCall violated section 46A-2-124(f) and 46A-6-104

of the WVCCPA by "threatening to commence arbitration that it did not intend to keep to coerce

consumers to pay debts."  (Opp'n Br. at 18-19.)  Yet once again, the Attorney General is unable

to cite to specific language within the WVCCPA that supports this cause of action.  *Id*. at 19.

Instead, the Attorney General cites to the Federal Fair Debt Collection Practices Act, a federal

statute that was not referenced in the original complaint against CashCall, as being consistent

with the Attorney General's claim against CashCall.  *Id.* at 19.  However, whether CashCall's alleged methods of debt collecting would violate federal law is irrelevant to whether CashCall violated the two WVCCPA sections cited in the sixth cause of action.  These sections do not support a cause of action against CashCall based on the facts alleged in the Complaint, and therefore, the sixth cause of action should be dismissed.

### CONCLUSION

As set forth above, the Attorney General has failed to refute CashCall's clear showing that the Second through Fourth Causes of Action in the Complaint do not present any viable claims, because each claim is brought under the WVCCPA, which by virtue of federal preemption is inapplicable to the lending activities of CashCall as the Bank's agent in originating loans made by the Bank to residents of West Virginia.  The Attorney General has also failed to demonstrate that the First and Sixth Causes of Action state a claim under West Virginia law.  Accordingly, CashCall respectfully requests that the Court grant its motion to dismiss Causes of Action One through Four and Six of Attorney General's Complaint, with prejudice.

**CASHCALL, INC.**

**By Spilman Thomas & Battle, PLLC**

   /s/ Bruce M. Jacobs
Charles L. Woody (WV State Bar No. 4130)
Bruce M. Jacobs (WV State Bar No. 6333)
P.O. Box 273
Charleston, WV  25321-0273
304.340.3800
304.340.3801 (*facsimile*)
bjacobs@spilmanlaw.com
cwoody@spilmanlaw.com

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**STATE OF WEST VIRGINIA ex rel.**
**DARRELL V. McGRAW, JR.,**
**ATTORNEY GENERAL,**

        **Plaintiff,**

**v.**                            **Civil Action No. 2:08-cv-01292**
                                    **Judge Joseph R. Goodwin**

**CASHCALL, INC., and**
**J. PAUL REDDAM, in his capacity as**
**President and CEO of CashCall, Inc.,**

        **Defendants.**

### CERTIFICATE OF SERVICE

      I, Bruce M. Jacobs, hereby certify that on January 15, 2009, I electronically filed the foregoing **Reply Memorandum of Law in Support of Defendant CashCall's Motion to Dismiss** with the Clerk of the Court using the CM/ECF system, which will send notification of such filling to the following:

                Norman Googel, Esquire
                Assistant Attorney General
                Office of the Attorney General
                812 Quarrier Street
                Charleston, WV  25326-1789
                ***Counsel for Plaintiff***

                /s/ Bruce M. Jacobs
                Bruce M. Jacobs (WV State Bar No. 6333)